# BALTIMORE CITY DEPARTMENT OF SOCIAL SERVICES *v.* BOUKNIGHT

No. 88–1182.   Argued November 7, 1989—Decided February 20, 1990*

———————
*Together with No. 88–6651, *Maurice M.* v. *Bouknight*, also on certiorari to the same court.

550

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, STEVENS, SCALIA, and KENNEDY, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, *post*, p. 563.

*Ralph S. Tyler III* argued the cause for petitioner in No. 88–1182. With him on the briefs were *J. Joseph Curran, Jr.*, Attorney General of Maryland, and *Andrew H. Baida* and *Carmen M. Shepard*, Assistant Attorneys General. *Mitchell Y. Mirviss* argued the cause for petitioner in No. 88–6651. With him on the briefs were *Susan Dishler Shubin, Stuart R. Cohen, Kathi Grasso*, and *M. Gayle Hafner*.

*George E. Burns, Jr.*, argued the cause for respondent. With him on the brief were *Jose F. Anderson, George M. Lipman, Gary S. Offutt, Robin Parsons*, and *M. Christina Gutierrez.*†

JUSTICE O'CONNOR delivered the opinion of the Court.

In this action, we must decide whether a mother, the custodian of a child pursuant to a court order, may invoke the Fifth Amendment privilege against self-incrimination to resist an order of the juvenile court to produce the child. We hold that she may not.

I

Petitioner Maurice M. is an abused child. When he was three months old, he was hospitalized with a fractured left femur, and examination revealed several partially healed bone fractures and other indications of severe physical abuse. In the hospital, respondent Bouknight, Maurice's mother,

---

†Briefs of *amici curiae* urging reversal were filed for the Commonwealth of Massachusetts et al. by *James M. Shannon*, Attorney General of Massachusetts, *Judy G. Zeprun, Judith Fabricant*, and *Countess C. Williams*, Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Douglas B. Baily* of Alaska, *Robert A. Corbin* of Arizona, *John K. Van de Kamp* of California, *John J. Kelly* of Connecticut, *Charles M. Oberly III* of Delaware, *Neil F. Hartigan* of Illinois, *Gordon Allen* of Iowa, *Robert T. Stephan* of Kansas, *William J. Guste, Jr.*, of Louisiana, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Brian McKay* of Nevada, *Jeffrey Howard* of New Hampshire, *Peter N. Perretti, Jr.*, of New Jersey, *Hal Stratton* of New Mexico, *Nicholas Spaeth* of North Dakota, *Dave Frohnmayer* of Oregon, *Ernest D. Preate, Jr.*, of Pennsylvania, *T. Travis Medlock* of South Carolina, *Roger A. Tellinghuisen* of South Dakota, *Jeffrey L. Amestoy* of Vermont, *Mary Sue Terry* of Virginia, *Charlie Brown* of West Virginia, and *Joseph B. Meyer* of Wyoming; for Advocates for Children and Youth Inc. by *Cheri Wyron Levin;* for the Criminal Justice Legal Foundation by *Kent S. Scheidegger;* for the Juvenile Protective Association by *Thomas H. Morsch;* and for the U. S. Conference of Mayors et al. by *Benna Ruth Solomon, Melvin Spaeth*, and *Donald O. Beers*.

*William L. Grimm* filed a brief for Charles M. as *amicus curiae.*

was observed shaking Maurice, dropping him in his crib despite his spica cast, and otherwise handling him in a manner inconsistent with his recovery and continued health. Hospital personnel notified the Baltimore City Department of Social Services (BCDSS), petitioner in No. 88–1182, of suspected child abuse. In February 1987, BCDSS secured a court order removing Maurice from Bouknight's control and placing him in shelter care. Several months later, the shelter care order was inexplicably modified to return Maurice to Bouknight's custody temporarily. Following a hearing held shortly thereafter, the juvenile court declared Maurice to be a "child in need of assistance," thus asserting jurisdiction over Maurice and placing him under BCDSS' continuing oversight. BCDSS agreed that Bouknight could continue as custodian of the child, but only pursuant to extensive conditions set forth in a court-approved protective supervision order. The order required Bouknight to "cooperate with BCDSS," "continue in therapy," participate in parental aid and training programs, and "refrain from physically punishing [Maurice]." App. to Pet. for Cert. 86a. The order's terms were "all subject to the further Order of the Court." *Id.*, at 87a. Bouknight's attorney signed the order, and Bouknight in a separate form set forth her agreement to each term.

Eight months later, fearing for Maurice's safety, BCDSS returned to juvenile court. BCDSS caseworkers related that Bouknight would not cooperate with them and had in nearly every respect violated the terms of the protective order. BCDSS stated that Maurice's father had recently died in a shooting incident and that Bouknight, in light of the results of a psychological examination and her history of drug use, could not provide adequate care for the child. App. 33–34. On April 20, 1988, the court granted BCDSS' petition to remove Maurice from Bouknight's control for placement in foster care. BCDSS officials also petitioned for judicial relief from Bouknight's failure to produce Maurice or reveal where he could be found. *Id.*, at 36–39. The petition

recounted that on two recent visits by BCDSS officials to Bouknight's home, she had refused to reveal the location of the child or had indicated that the child was with an aunt whom she would not identify. The petition further asserted that inquiries of Bouknight's known relatives had revealed that none of them had recently seen Maurice and that BCDSS had prompted the police to issue a missing persons report and referred the case for investigation by the police homicide division. Also on April 20, the juvenile court, upon a hearing on the petition, cited Bouknight for violating the protective custody order and for failing to appear at the hearing. Bouknight had indicated to her attorney that she would appear with the child, but also expressed fear that if she appeared the State would "'snatch the child.'" *Id.*, at 42, 54. The court issued an order to show cause why Bouknight should not be held in civil contempt for failure to produce the child. Expressing concern that Maurice was endangered or perhaps dead, the court issued a bench warrant for Bouknight's appearance. *Id.*, at 51–57.

Maurice was not produced at subsequent hearings. At a hearing one week later, Bouknight claimed that Maurice was with a relative in Dallas. Investigation revealed that the relative had not seen Maurice. The next day, following another hearing at which Bouknight again declined to produce Maurice, the juvenile court found Bouknight in contempt for failure to produce the child as ordered. There was and has been no indication that she was unable to comply with the order. The court directed that Bouknight be imprisoned until she "purge[d] herself of contempt by either producing [Maurice] before the court or revealing to the court his exact whereabouts." App. to Pet. for Cert. 82a.

The juvenile court rejected Bouknight's subsequent claim that the contempt order violated the Fifth Amendment's guarantee against self-incrimination. The court stated that the production of Maurice would purge the contempt and that "[t]he contempt is issued not because she refuse[d] to

testify in any proceeding . . . [but] because she has failed to abide by the Order of this Court, mainly [for] the production of Maurice M." App. 150. While that decision was being appealed, Bouknight was convicted of theft and sentenced to 18 months' imprisonment in separate proceedings. The Court of Appeals of Maryland vacated the juvenile court's judgment upholding the contempt order. *In re Maurice M.*, 314 Md. 391, 550 A. 2d 1135 (1988). The Court of Appeals found that the contempt order unconstitutionally compelled Bouknight to admit through the act of production "a measure of continuing control and dominion over Maurice's person" in circumstances in which "Bouknight has a reasonable apprehension that she will be prosecuted." *Id.*, at 403–404, 550 A. 2d, at 1141. CHIEF JUSTICE REHNQUIST granted BCDSS' application for a stay of the judgment and mandate of the Maryland Court of Appeals, pending disposition of the petition for a writ of certiorari. 488 U. S. 1301 (1988) (in chambers). We granted certiorari, 490 U. S. 1003 (1989), and we now reverse.

## II

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself." The Fifth Amendment's protection "applies only when the accused is compelled to make a *testimonial* communication that is incriminating." *Fisher* v. *United States*, 425 U. S. 391, 408 (1976); see *Doe* v. *United States*, 487 U. S. 201, 207, 209–210, n. 8 (1988) *(Doe II); Schmerber* v. *California*, 384 U. S. 757, 761 (1966) ("[T]he privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature"). The juvenile court concluded that Bouknight could comply with the order through the unadorned act of producing the child, and we thus address that aspect of the order. When the government demands that an item be produced, "the only thing compelled is the act of pro-

ducing the [item]." *Fisher, supra,* at 410, n. 11; see *United States* v. *Doe,* 465 U. S. 605, 612 (1984) *(Doe I).* The Fifth Amendment's protection may nonetheless be implicated because the act of complying with the government's demand testifies to the existence, possession, or authenticity of the things produced. See *Doe II, supra,* at 209; *Doe I, supra,* at 612–614, and n. 13; *Fisher, supra,* at 410–413. But a person may not claim the Amendment's protections based upon the incrimination that may result from the contents or nature of the thing demanded. *Doe I,* 465 U. S., at 612, and n. 10; *id.,* at 618 (O'CONNOR, J., concurring); *Fisher, supra,* at 408–410. Bouknight therefore cannot claim the privilege based upon anything that examination of Maurice might reveal, nor can she assert the privilege upon the theory that compliance would assert that the child produced is in fact Maurice (a fact the State could readily establish, rendering any testimony regarding existence or authenticity insufficiently incriminating, see *Fisher, supra,* at 411). Rather, Bouknight claims the benefit of the privilege because the act of production would amount to testimony regarding her control over, and possession of, Maurice. Although the State could readily introduce evidence of Bouknight's continuing control over the child—*e. g.,* the custody order, testimony of relatives, and Bouknight's own statements to Maryland officials before invoking the privilege—her implicit communication of control over Maurice at the moment of production might aid the State in prosecuting Bouknight.

The possibility that a production order will compel testimonial assertions that may prove incriminating does not, in all contexts, justify invoking the privilege to resist production. See *infra,* at 556–558. Even assuming that this limited testimonial assertion is sufficiently incriminating and "sufficiently testimonial for purposes of the privilege," *Fisher, supra,* at 411, Bouknight may not invoke the privilege to resist the production order because she has assumed custodial duties re-

lated to production and because production is required as part of a noncriminal regulatory regime.

The Court has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws. In *Shapiro* v. *United States*, 335 U. S. 1 (1948), the Court considered an application of the Emergency Price Control Act of 1942 and a regulation issued thereunder which required licensed businesses to maintain records and make them available for inspection by administrators. The Court indicated that no Fifth Amendment protection attached to production of the "required records," which the "'defendant was required to keep, not for his private uses, but for the benefit of the public, and for public inspection.'" *Id.*, at 17–18 (quoting *Wilson* v. *United States*, 221 U. S. 361, 381 (1911)). The Court's discussion of the constitutional implications of the scheme focused upon the relation between the Government's regulatory objectives and the Government's interest in gaining access to the records in Shapiro's possession:

> "It may be assumed at the outset that there are limits which the Government cannot constitutionally exceed in requiring the keeping of records which may be inspected by an administrative agency and may be used in prosecuting statutory violations committed by the record-keeper himself. But no serious misgiving that those bounds have been overstepped would appear to be evoked when there is a sufficient relation between the activity sought to be regulated and the public concern so that the Government can constitutionally regulate or forbid the basic activity concerned, and can constitutionally require the keeping of particular records, subject to inspection by the Administrator." 335 U. S., at 32.

See also *In re Harris*, 221 U. S. 274, 279 (1911) (Holmes, J.) (regarding a court order that a bankrupt produce account

books, "[t]he question is not of testimony but of surrender—not of compelling the bankrupt to be a witness against himself in a criminal case, past or future, but of compelling him to yield possession of property that he no longer is entitled to keep"). The Court has since refined those limits to the government's authority to gain access to items or information vested with this public character. The Court has noted that "the requirements at issue in *Shapiro* were imposed in 'an essentially non-criminal and regulatory area of inquiry,'" and that *Shapiro*'s reach is limited where requirements "are directed to a 'selective group inherently suspect of criminal activities.'" *Marchetti* v. *United States*, 390 U. S. 39, 57 (1968) (quoting *Albertson* v. *Subversive Activities Control Board*, 382 U. S. 70, 79 (1965)); see *Grosso* v. *United States*, 390 U. S. 62, 68 (1968) (*Shapiro* inapplicable because "[h]ere, as in *Marchetti*, the statutory obligations are directed almost exclusively to individuals inherently suspect of criminal activities"); *Haynes* v. *United States*, 390 U. S. 85, 98–99 (1968).

*California* v. *Byers*, 402 U. S. 424 (1971), confirms that the ability to invoke the privilege may be greatly diminished when invocation would interfere with the effective operation of a generally applicable, civil regulatory requirement. In *Byers*, the Court upheld enforcement of California's statutory requirement that drivers of cars involved in accidents stop and provide their names and addresses. A plurality found the risk of incrimination too insubstantial to implicate the Fifth Amendment, *id.*, at 427–428, and noted that the statute "was not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities," *id.*, at 430, was "'directed at the public at large,'" *ibid.* (quoting *Albertson* v. *Subversive Activities Control Board, supra*, at 79), and required disclosure of no inherently illegal activity. See also *United States* v. *Sullivan*, 274 U. S. 259 (1927) (rejecting Fifth Amendment objection to requirement to file income tax return). Justice Harlan, the author of *Marchetti*, *Grosso*, and *Haynes*, concurred in the judgment. He distin-

guished those three cases as considering statutory schemes that "focused almost exclusively on conduct which was criminal," 402 U. S., at 454. While acknowledging that in particular cases the California statute would compel incriminating testimony, he concluded that the noncriminal purpose and the general applicability of the reporting requirement demanded compliance even in such cases. *Id.*, at 458.

When a person assumes control over items that are the legitimate object of the government's noncriminal regulatory powers, the ability to invoke the privilege is reduced. In *Wilson* v. *United States, supra,* the Court surveyed a range of cases involving the custody of public documents and records required by law to be kept because they related to "the appropriate subjects of governmental regulation and the enforcement of restrictions validly established." *Id.*, at 380. The principle the Court drew from these cases is:

> "[W]here, by virtue of their character and the rules of law applicable to them, the books and papers are held subject to examination by the demanding authority, the custodian has no privilege to refuse production although their contents tend to criminate him. In assuming their custody he has accepted the incident obligation to permit inspection." *Id.*, at 382.

See also *Braswell* v. *United States,* 487 U. S. 99, 109–113 (1988); *Curcio* v. *United States,* 354 U. S. 118, 123–124 (1957) ("A custodian, by assuming the duties of his office, undertakes the obligation to produce the books of which he is custodian in response to a rightful exercise of the State's visitorial powers"). In *Shapiro,* the Court interpreted this principle as extending well beyond the corporate context, 335 U. S., at 16–20, and emphasized that Shapiro had assumed and retained control over documents in which the Government had a direct and particular regulatory interest. *Id.*, at 7–8, 14–15. Indeed, it was in part Shapiro's custody over items having this public nature that allowed the Court in *Marchetti, supra,* at 57, *Grosso, supra,* at 69, and *Haynes, supra,* at 99, to dis-

tinguish the measures considered in those cases from the regulatory requirement at issue in *Shapiro*.

These principles readily apply to this case. Once Maurice was adjudicated a child in need of assistance, his care and safety became the particular object of the State's regulatory interests. See 314 Md., at 404, 550 A. 2d, at 1141; Md. Cts. & Jud. Proc. Code Ann. §§ 3–801(e), 3–804(a) (Supp. 1989); see also App. 105 ("This court has jurisdiction to require at all times to know the whereabouts of the minor child. We asserted jurisdiction over that child in the spring of 1987 . . ."). Maryland first placed Maurice in shelter care, authorized placement in foster care, and then entrusted responsibility for Maurice's care to Bouknight. By accepting care of Maurice subject to the custodial order's conditions (including requirements that she cooperate with BCDSS, follow a prescribed training regime, and be subject to further court orders), Bouknight submitted to the routine operation of the regulatory system and agreed to hold Maurice in a manner consonant with the State's regulatory interests and subject to inspection by BCDSS. Cf. *Shapiro* v. *United States, supra.* In assuming the obligations attending custody, Bouknight "has accepted the incident obligation to permit inspection." *Wilson*, 221 U. S., at 382. The State imposes and enforces that obligation as part of a broadly directed, noncriminal regulatory regime governing children cared for pursuant to custodial orders. See Md. Cts. & Jud. Proc. Code Ann. § 3–802(a) (1984) (setting forth child protective purposes of subtitle, including "provid[ing] for the care, protection, and wholesome mental and physical development of children coming within the provisions of this subtitle"); see also Md. Cts. & Jud. Proc. Code Ann. §§ 3–820(b), (c) (Supp. 1989); *In re Jessica M.*, 312 Md. 93, 538 A. 2d 305 (1988).

Persons who care for children pursuant to a custody order, and who may be subject to a request for access to the child, are hardly a "'selective group inherently suspect of criminal activities.'" *Marchetti, supra,* at 57 (quoting *Albertson* v.

*Subversive Activities Control Board,* 382 U. S., at 79). The juvenile court may place a child within its jurisdiction with social service officials or "under supervision in his own home or in the custody or under the guardianship of a relative or other fit person, upon terms the court deems appropriate." Md. Cts. & Jud. Proc. Code Ann. § 3–820(c)(1)(i) (Supp. 1989). Children may be placed, for example, in foster care, in homes of relatives, or in the care of state officials. See, *e. g., In re Jessica M., supra; In re Arlene G.,* 301 Md. 355, 483 A. 2d 39 (1984); *Maryland Dept. of Health and Mental Hygiene* v. *Prince George's County Dept. of Social Services,* 47 Md. App. 436, 423 A. 2d 589 (1980). Even when the court allows a parent to retain control of a child within the court's jurisdiction, that parent is not one singled out for criminal conduct, but rather has been deemed to be, without the State's assistance, simply "unable or unwilling to give proper care and attention to the child and his problems." Md. Cts. & Jud. Proc. Code Ann. § 3–801(e) (Supp. 1989); see *In re Jertrude O.,* 56 Md. App. 83, 466 A. 2d 885 (1983), cert. denied, 298 Md. 309, 469 A. 2d 863 (1984). The provision that authorized the juvenile court's efforts to gain production of Maurice reflects this broad applicability. See Md. Cts. & Jud. Proc. Code Ann. § 3–814(c) (1984) ("If a parent, guardian, or custodian fails to bring the child before the court when requested, the court may issue a writ of attachment directing that the child be taken into custody and brought before the court. The court may proceed against the parent, guardian, or custodian for contempt"). This provision "fairly may be said to be directed at . . . parents, guardians, and custodians who accept placement of juveniles in custody." 314 Md., at 418, 550 A. 2d, at 1148 (McAuliffe, J., dissenting).

Similarly, BCDSS' efforts to gain access to children, as well as judicial efforts to the same effect, do not "focu[s] almost exclusively on conduct which was criminal." *Byers,* 402 U. S., at 454 (Harlan, J., concurring in judgment). Many orders will arise in circumstances entirely devoid of

criminal conduct. Even when criminal conduct may exist, the court may properly request production and return of the child, and enforce that request through exercise of the contempt power, for reasons related entirely to the child's well-being and through measures unrelated to criminal law enforcement or investigation. See Maryland Cts. & Jud. Proc. Code Ann. § 3–814(c) (1984). This case provides an illustration: concern for the child's safety underlay the efforts to gain access to and then compel production of Maurice. See App. 33–39, 53–55, 150, 155–158; see also 314 Md., at 419, 550 A. 2d, at 1149 (McAuliffe, J., dissenting). Finally, production in the vast majority of cases will embody no incriminating testimony, even if in particular cases the act of production may incriminate the custodian through an assertion of possession or the existence, or the identity, of the child. Cf. *Byers*, 402 U. S., at 430–431; *id.*, at 458 (Harlan, J., concurring in judgment). These orders to produce children cannot be characterized as efforts to gain some testimonial component of the act of production. The government demands production of the very public charge entrusted to a custodian, and makes the demand for compelling reasons unrelated to criminal law enforcement and as part of a broadly applied regulatory regime. In these circumstances, Bouknight cannot invoke the privilege to resist the order to produce Maurice.

We are not called upon to define the precise limitations that may exist upon the State's ability to use the testimonial aspects of Bouknight's act of production in subsequent criminal proceedings. But we note that imposition of such limitations is not foreclosed. The same custodial role that limited the ability to resist the production order may give rise to corresponding limitations upon the direct and indirect use of that testimony. See *Braswell*, 487 U. S., at 118, and n. 11. The State's regulatory requirement in the usual case may neither compel incriminating testimony nor aid a criminal prosecution, but the Fifth Amendment protections are not thereby necessarily unavailable to the person who complies

with the regulatory requirement after invoking the privilege and subsequently faces prosecution. See *Marchetti*, 390 U. S., at 58–59 (the "attractive and apparently practical" course of subsequent use restriction is not appropriate where a significant element of the regulatory requirement is to aid law enforcement); see also *Leary* v. *United States*, 395 U. S. 6, 26–27 (1969); *Haynes*, 390 U. S., at 100; *Grosso*, 390 U. S., at 69; cf. *Doe I*, 465 U. S., at 617, n. 17 (scope of restriction). In a broad range of contexts, the Fifth Amendment limits prosecutors' ability to use testimony that has been compelled. See *Simmons* v. *United States*, 390 U. S. 377, 391–394 (1968) (no subsequent admission of testimony provided in suppression hearing); *Murphy* v. *Waterfront Comm'n of New York Harbor*, 378 U. S. 52, 75–76, 79 (1964) (Fifth Amendment bars use, in criminal processes, in other jurisdictions of testimony compelled pursuant to a grant of use immunity in one jurisdiction); *Maness* v. *Meyers*, 419 U. S. 449, 474–475 (1975) (WHITE, J., concurring in result); *Adams* v. *Maryland*, 347 U. S. 179, 181 (1954) ("[A] witness does not need any statute to protect him from the use of self-incriminating testimony he is compelled to give over his objection. The Fifth Amendment takes care of that without a statute"); see also *New Jersey* v. *Portash*, 440 U. S. 450 (1979); *Garrity* v. *New Jersey*, 385 U. S. 493, 500 (1967). But cf. *Doe I, supra*, at 616–617 (construing federal use immunity statute, 18 U. S. C. §§ 6001–6005); *Pillsbury Co.* v. *Conboy*, 459 U. S. 248, 261–262 (1983) (declining to supplement previous grant of federal use immunity).

### III

The judgment of the Court of Appeals of Maryland is reversed, and the cases are remanded to that court for further proceedings not inconsistent with this opinion.

*So ordered.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Although the Court assumes that respondent's act of producing her child would be testimonial and could be incriminating, *ante,* at 555, it nonetheless concludes that she cannot invoke her privilege against self-incrimination and refuse to reveal her son's current location. Neither of the reasons the Court articulates to support its refusal to permit respondent to invoke her constitutional privilege justifies its decision. I therefore dissent.

I

The Court correctly assumes, *ante,* at 555, that Bouknight's production of her son to the Maryland court would be testimonial because it would amount to an admission of Bouknight's physical control over her son. See *Fisher* v. *United States,* 425 U. S. 391, 410 (1976) (acts of production are testimonial if they contain implicit statement of fact). Accord, *United States* v. *Doe,* 465 U. S. 605, 612–613 (1984). The Court also assumes, *ante,* at 555, that Bouknight's act of production would be self-incriminating. I would not hesitate to hold explicitly that Bouknight's admission of possession or control presents a "'real and appreciable'" threat of self-incrimination. *Marchetti* v. *United States,* 390 U. S. 39, 48 (1968). Bouknight's ability to produce the child would conclusively establish her actual and present physical control over him, and thus might "prove a significant 'link in a chain' of evidence tending to establish [her] guilt." *Ibid.* (footnote omitted).

Indeed, the stakes for Bouknight are much greater than the Court suggests. Not only could she face criminal abuse and neglect charges for her alleged mistreatment of Maurice, but she could also be charged with causing his death. The State acknowledges that it suspects that Maurice is dead, and the police are investigating his case as a possible homicide.

In these circumstances, the potentially incriminating aspects to Bouknight's act of production are undoubtedly significant.

## II

Notwithstanding the real threat of self-incrimination, the Court holds that "Bouknight may not invoke the privilege to resist the production order because she has assumed custodial duties related to production and because production is required as part of a noncriminal regulatory regime." *Ante*, at 555–556. In characterizing Bouknight as Maurice's "custodian," and in describing the relevant Maryland juvenile statutes as part of a noncriminal regulatory regime, the Court relies on two distinct lines of Fifth Amendment precedent, neither of which applies to this litigation.

## A

The Court's first line of reasoning turns on its view that Bouknight has agreed to exercise on behalf of the State certain custodial obligations with respect to her son, obligations that the Court analogizes to those of a custodian of the records of a collective entity. See *ante*, at 558–559. This characterization is baffling, both because it is contrary to the facts of this case and because this Court has never relied on such a characterization to override the privilege against self-incrimination except in the context of a claim of privilege by an agent of a collective entity.[1]

---

[1] The Court claims that the principle espoused in the collective entity cases was "extend[ed] well beyond the corporate context" in *Shapiro* v. *United States*, 335 U. S. 1 (1948). *Ante*, at 558. *Shapiro*, however, did not rest on the existence of an agency relationship between a collective entity and the custodian of its records. Instead, the petitioner was denied the Fifth Amendment privilege because the records sought were kept as part of a generalized regulatory system that required all businesses, unincorporated as well as incorporated, to retain records of certain transactions. See 335 U. S., at 22–23, 27, 33. *Shapiro* turned on the Court's view "that the privilege which exists as to private papers cannot be maintained in relation to 'records required by law to be kept in order that there may be suitable information of transactions which are the appropriate sub-

Jacqueline Bouknight is Maurice's mother; she is not, and in fact could not be, his "custodian" whose rights and duties are determined solely by the Maryland juvenile protection law. See Md. Cts. & Jud. Proc. Code Ann. § 3–801(j) (Supp. 1989) (defining "custodian" as "person or agency to whom legal custody of a child has been given by order of the court, other than the child's parent or legal guardian"). Although Bouknight surrendered physical custody of her child during the pendency of the proceedings to determine whether Maurice was a "child in need of assistance" (CINA) within the meaning of the Maryland Code, § 3–801(e), Maurice's placement in shelter care was only temporary and did not extinguish her legal right to custody of her son. See § 3–801(r). When the CINA proceedings were settled, Bouknight regained physical custody of Maurice and entered into an agreement with the Baltimore City Department of Social Services (BCDSS). In that agreement, which was approved by the juvenile court, Bouknight promised, among other things, to "cooperate with BCDSS," App. 28, but she retained legal custody of Maurice.

A finding that a child is in need of assistance does not by itself divest a parent of legal or physical custody, nor does it transform such custody to something conferred by the State. See, e. g., In re Jertrude O., 56 Md. App. 83, 97–98, 466 A. 2d 885, 893 (1983) (proving a child is a CINA differs significantly from proving that the parent's rights to legal and physical custody should be terminated). Thus, the parent of a CINA continues to exercise custody because she is

---

jects of governmental regulation and the enforcement of restrictions validly established.'" Id., at 33 (quoting Davis v. United States, 328 U. S. 582, 589–590 (1946)). See also Marchetti v. United States, 390 U. S. 39, 57 (1968) (describing rationale in Shapiro); ante, at 558 (emphasizing that Shapiro had custody of "documents in which the Government had a direct and particular regulatory interest" (emphasis added)). Thus, Shapiro is properly analyzed with the cases concerning testimony required as a part of a noncriminal regulatory regime, rather than with the cases concerning testimony compelled from custodians of collective entities' records.

the child's parent, not because the State has delegated that responsibility to her. Although the State has obligations "[t]o provide for the care, protection, and wholesome mental and physical development of children" who are in need of assistance, Md. Cts. & Jud. Proc. Code Ann. § 3–802(a)(1) (1984), these duties do not eliminate or override a parent's continuing legal obligations similarly to provide for her child.

In light of the statutory structure governing a parent's relationship to a CINA, Bouknight is not acting as a custodian in the traditional sense of that word because she is not acting *on behalf of the State.* In reality, she continues to exercise her parental duties, constrained by an agreement between her and the State. That agreement, which includes a stipulation that Maurice was a CINA, allows the State, in certain circumstances, to intercede in Bouknight's relationship with her child. It does not, however, confer custodial rights and obligations on Bouknight in the same way corporate law creates the custodial status of a corporate agent.

Moreover, the rationale for denying a corporate custodian Fifth Amendment protection for acts done in her representative capacity does not apply to this case. The rule for a custodian of corporate records rests on the well-established principle that a collective entity, unlike a natural person, has no Fifth Amendment privilege against self-incrimination. See *Hale* v. *Henkel,* 201 U. S. 43, 69–70 (1906) (corporation has no privilege); *United States* v. *White,* 322 U. S. 694, 701 (1944) (labor union has no privilege). Because an artificial entity can act only through its agents, a custodian of such an entity's documents may not invoke her personal privilege to resist producing documents that may incriminate the entity, even if the documents may also incriminate the custodian. *Wilson* v. *United States,* 221 U. S. 361, 384–385 (1911). As we explained in *White:*

"[I]ndividuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely per-

sonal privileges. Rather they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations. . . . And the official records and documents of the organization that are held by them *in a representative rather than in a personal capacity* cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally." 322 U. S., at 699 (citations omitted; emphasis added).

Jacqueline Bouknight is not the agent for an artificial entity that possesses no Fifth Amendment privilege. Her role as Maurice's parent is very different from the role of a corporate custodian who is merely the instrumentality through whom the corporation acts. I am unwilling to extend the collective entity doctrine into a context where it denies individuals, acting in their personal rather than representative capacities, their constitutional privilege against self-incrimination.

### B

The Court's decision rests as well on cases holding that "the ability to invoke the privilege may be greatly diminished when invocation would interfere with the effective operation of a generally applicable, civil regulatory requirement." *Ante*, at 557. The cases the Court cites have two common features: they concern civil regulatory systems not primarily intended to facilitate criminal investigations, and they target the general public. See *California* v. *Byers*, 402 U. S. 424, 430–431 (1971) (determining that a "hit and run" statute that required a driver involved in an accident to stop and give certain information was primarily civil). In contrast, regulatory regimes that are directed at a "'selective group inherently suspect of criminal activities,'" *Marchetti*, 390 U. S., at 57 (quoting *Albertson* v. *Subversive Activities Control Board*, 382 U. S. 70, 79 (1965)), do not result in a similar diminution of the Fifth Amendment privilege.

Applying the first feature to this case, the Court describes Maryland's juvenile protection scheme as "a broadly directed, noncriminal regulatory regime governing children cared for pursuant to custodial orders." *Ante*, at 559. The Court concludes that Bouknight cannot resist an order necessary for the functioning of that system. The Court's characterization of Maryland's system is dubious and highlights the flaws inherent in the Court's formulation of the appropriate Fifth Amendment inquiry. Virtually any civil regulatory scheme could be characterized as essentially noncriminal by looking narrowly or, as in this case, *solely* to the avowed noncriminal purpose of the regulations. If one focuses instead on the practical effects, the same scheme could be seen as facilitating criminal investigations. The fact that the Court holds Maryland's juvenile statute to be essentially noncriminal, notwithstanding the overlapping purposes underlying that statute and Maryland's criminal child abuse statutes, proves that the Court's test will never be used to find a relationship between the civil scheme and law enforcement goals significant enough to implicate the Fifth Amendment.

The regulations embodied in the juvenile welfare statute are intimately related to the enforcement of state criminal statutes prohibiting child abuse, Md. Ann. Code, Art. 27, § 35A (1987). State criminal decisions suggest that information supporting criminal convictions is often obtained through civil proceedings and the subsequent protective oversight by BCDSS. See, *e. g.*, *Lee* v. *State*, 62 Md. App. 341, 489 A. 2d 87 (1985). See also 3 Code of Md. Regs. §§ 07.02.07.08(A)(1) and 07.02.07.08(C)(1)(b) (1988) (requiring Social Services Administration to maintain a Child Abuse Central Registry and allowing law enforcement officials access to the Registry). In this respect, Maryland's juvenile protection system resembles the revenue system at issue in *Marchetti*, which required persons engaged in the business of accepting wagers to provide certain information about their activities to the

Federal Government. Focusing on the effects of the regulatory scheme, the Court held that this revenue system was not the sort of neutral civil regulatory scheme that could trump the Fifth Amendment privilege. Even though the Government's "principal interest [was] evidently the collection of revenue," 390 U. S., at 57, the information sought would increase the "likelihood that any past or present gambling offenses [would] be discovered and successfully prosecuted," *id.*, at 52.

In contrast to *Marchetti*, the Court here disregards the practical implications of the civil scheme and holds that the juvenile protection system does not "'focu[s] almost exclusively on conduct which was criminal.'" *Ante*, at 560 (quoting *Byers*, *supra*, at 454 (Harlan, J., concurring in judgment). See also *Byers*, *supra*, at 430 (plurality opinion) (determining statute at issue to be "essentially regulatory, not criminal"). I cannot agree with this approach. The State's goal of protecting children from abusive environments through its juvenile welfare system cannot be separated from criminal provisions that serve the same goal. When the conduct at which a civil statute aims—here, child abuse and neglect—is frequently the same conduct subject to criminal sanction, it strikes me as deeply problematic to dismiss the Fifth Amendment concerns by characterizing the civil scheme as "unrelated to criminal law enforcement or investigation," *ante*, at 561. A civil scheme that *inevitably* intersects with criminal sanctions may not be used to coerce, on pain of contempt, a potential criminal defendant to furnish evidence crucial to the success of her own prosecution.

I would apply a different analysis, one that is more faithful to the concerns underlying the Fifth Amendment. This approach would target respondent's particular claim of privilege, the precise nature of the testimony sought, and the likelihood of self-incrimination caused by this respondent's compliance. "To sustain the privilege, it need only be evident from the implications of the question, in the setting in

which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman* v. *United States*, 341 U. S. 479, 486–487 (1951). Accord, *Marchetti, supra,* at 48; *Malloy* v. *Hogan*, 378 U. S. 1, 11–12 (1964). This analysis unambiguously indicates that Bouknight's Fifth Amendment privilege must be respected to protect her from the serious risk of self-incrimination. See *supra,* at 563–564.

An individualized inquiry is preferable to the Court's analysis because it allows the privilege to turn on the concrete facts of a particular case, rather than on abstract characterizations concerning the nature of a regulatory scheme. Moreover, this particularized analysis would not undermine any appropriate goals of civil regulatory schemes that may intersect with criminal prohibitions. Instead, the ability of a State to provide immunity from criminal prosecution permits it to gather information necessary for civil regulation, while also preserving the integrity of the privilege against self-incrimination. The fact that the State throws a wide net in seeking information does not mean that it can demand from the few persons whose Fifth Amendment rights are implicated that they participate in their own criminal prosecutions. Rather, when the State demands testimony from its citizens, it should do so with an explicit grant of immunity.

2

The Court's approach includes a second element; it holds that a civil regulatory scheme cannot override Fifth Amendment protection unless it is targeted at the general public. Such an analysis would not be necessary under the particularized approach I advocate. Even under the Court's test, however, Bouknight's right against self-incrimination should not be diminished because Maryland's juvenile welfare scheme clearly is *not* generally applicable. A child is considered in need of assistance because "[h]e is mentally handi-

capped or is not receiving ordinary and proper care and attention, and . . . [h]is parents . . . are unable or unwilling to give proper care and attention to the child and his problems." Md. Cts. & Jud. Proc. Code Ann. § 3–801(e) (Supp. 1989). The juvenile court has jurisdiction only over children who are alleged to be in need of assistance, not over all children in the State. See § 3–804(a). It thus has power to compel testimony only from those parents whose children are alleged to be CINA's. In other words, the regulatory scheme that the Court describes as "broadly directed," *ante,* at 559, is actually narrowly targeted at parents who through abuse or neglect deny their children the minimal reasonable level of care and attention. Not all such abuse or neglect rises to the level of criminal child abuse, but parents of children who have been so seriously neglected or abused as to warrant allegations that the children are in need of state assistance are · clearly "a selective group inherently suspect of criminal activities." See *supra,* at 567.

### III

In the end, neither line of precedents relied on by the Court justifies riding roughshod over Bouknight's constitutional privilege against self-incrimination. The Court cannot accurately characterize her as a "custodian" in the same sense as the Court has used that word in the past. Nor is she the State's "agent," whom the State may require to act on its behalf. Moreover, the regulatory scheme at issue here is closely intertwined with the criminal regime prohibiting child abuse and applies only to parents whose abuse or neglect is serious enough to warrant state intervention.

Although I am disturbed by the Court's willingness to apply inapposite precedent to deny Bouknight her constitutional right against self-incrimination, especially in light of the serious allegations of homicide that accompany this civil proceeding, I take some comfort in the Court's recognition that the State may be prohibited from using any testimony given by Bouknight in subsequent criminal proceedings.

*Ante,* at 561 (leaving open the question of the "State's ability to use the testimonial aspects of Bouknight's act of production" in such criminal proceedings).[2] Because I am not content to deny Bouknight the constitutional protection required by the Fifth Amendment *now* in the hope that she will not be convicted *later* on the basis of her own testimony, I dissent.

---

[2] I note, with both exasperation and skepticism about the bona fide nature of the State's intentions, that the State may be able to grant Bouknight use immunity under a recently enacted immunity statute, even though it has thus far failed to do so. See 1989 Md. Laws, ch. 288 (amending § 9–123). Although the statute applies only to testimony "in a criminal prosecution or a proceeding before a grand jury of the State," Md. Cts. & Jud. Proc. Code Ann. § 9–123(b)(1) (Supp. 1989), the State represented to this Court that "[a]s a matter of law, [granting limited use immunity for the testimonial aspects of Bouknight's compliance with the production order] would now be possible," Tr. of Oral Arg. 10. If such a grant of immunity has been possible since July 1989 and the State has refused to invoke it so that it can litigate Bouknight's claim of privilege, I have difficulty believing that the State is sincere in its protestations of concern for Maurice's well-being.