*In re* MARRIAGE OF MARY KAY RONEY, Petitioner-Appellee, and CHRISTOPHER J. RONEY, Respondent-Appellant.

Fourth District No. 4—01—0785

Argued May 15, 2002.—Opinion filed July 17, 2002.

Robert G. Kirchner (argued), of Lerner & Kirchner, of Champaign, for appellant.

Darrell E. Statzer, Jr. (argued), of Decatur, for appellee.

JUSTICE STEIGMANN delivered the opinion of the court:

In October 2000, petitioner, Mary Kay Roney, filed a petition to dissolve her marriage to respondent, Christopher J. Roney. In January 2001, Mary Kay filed (1) a motion, seeking to require Christopher to

turn over tape recordings of her telephone conversations; and (2) a motion *in limine* to exclude the recordings from evidence. In May 2001, the trial court ordered Christopher to turn over all of the tape recordings Mary Kay had requested in discovery. In August 2001, the court found Christopher to be in indirect civil contempt for failing to turn over the tape recordings as ordered.

Christopher appeals, arguing that the trial court's order violates his fifth amendment privilege against self-incrimination (U.S. Const., amend. V) because the act of turning over the recordings would constitute a testimonial communication incriminating him in the criminal offense of eavesdropping (720 ILCS 5/14—2(a)(1) (West 2000)). We reverse in part, vacate in part, and remand for further proceedings.

## I. BACKGROUND

Mary Kay and Christopher married in November 1983. As stated, Mary Kay initiated dissolution proceedings, and in January 2001, she filed a motion *in limine* and sought a turnover order.

### A. Proceedings Leading to the Turnover Order

Along with her motion requesting a turnover order, Mary Kay filed an affidavit in which she stated that (1) she discovered wiretapping equipment in the attic of the marital residence; (2) Christopher admitted taping her telephone conversations; (3) she did not consent to the taping; and (4) she understood that approximately 30 tapes existed. In response to Mary Kay's motion, Christopher asserted his fifth amendment privilege against self-incrimination.

At a March 2001 hearing on Mary Kay's motions, Thad Trimble, a Champaign County sheriff's department evidence officer, testified regarding the items that Mary Kay had submitted to the police. Trimble stated that he took possession of "the GE tape recorder and plug-in, the white Radio Shack eavesdropping device, the Gemini phone modular plug, [a] crimping tool, seven cassette tapes with tape recorder, [and] three white cassette tapes with storage cases."

Mary Kay testified that on October 16, 2000, she went into the attic because she suspected that Christopher was storing pornography there. She explained that she had heard him going into the attic on a daily basis over the past eight months. The attic did not have a floor, and insulation covered most of the area. After a half hour poking around with a mop handle and lifting insulation, Mary Kay found the telephone recording device. In mid-November 2000, Mary Kay confronted Christopher about splicing the phone line, and Christopher admitted doing it and said that he did it to protect her.

The trial court allowed Mary Kay's counsel to play two of the

tapes, only one of which contained recordings of Mary Kay's telephone conversations. Mary Kay called Christopher as an adverse witness, but he refused to answer questions and asserted his fifth amendment rights.

At the conclusion of the hearing, the trial court granted Mary Kay's motion *in limine* after finding by a preponderance of the evidence that the tape containing recorded telephone conversations was obtained illegally. The court continued the hearing on Mary Kay's request for a turnover order until May 2001. At that hearing, Chase Leonard, an assistant State's Attorney, testified that a criminal prosecution of Christopher was unlikely. The trial court found that the fifth amendment privilege did not apply because turning over the tape recordings was not testimonial in nature. The court ordered Christopher to turn over the tapes by May 29, 2001. Christopher filed a motion for rehearing, but never called it for a hearing.

### B. Contempt Proceedings

At the August 2001 hearing on Mary Kay's petition for adjudication of indirect civil contempt, Christopher testified as an adverse witness that he did not turn over any tapes. He then asserted his fifth amendment rights when asked if he had the tapes or knew of their location.

When Christopher testified on his own behalf, his counsel asked him, "Do you have a reason that you did not turn over any tapes that might be in your possession?" He responded, "What tapes? Are you asking—what makes them think I have any tapes?" Mary Kay's counsel objected to the answer and moved to strike it as nonresponsive, and the trial court ordered the volunteered portion stricken.

Following the hearing, the trial court found Christopher in indirect civil contempt for having willfully disobeyed the court's order to turn over all tape recordings to Mary Kay. The court ordered Christopher to be incarcerated in the county jail until he (1) turned over all tapes as ordered, and (2) filed an affidavit stating that the materials turned over constituted all of the tapes in his possession or control or both. Alternatively, the court ordered that Christopher could file an affidavit stating that no tapes were in his possession or control.

This appeal followed, and the trial court granted Christopher's motion for a stay pending appeal.

### II. ANALYSIS

The sole issue before us is whether the act of turning over tape-recorded telephone conversations, which were obtained by eavesdropping in violation of criminal law, constitutes an incriminating testimonial communication protected by the fifth amendment privilege. We conclude that it does.

■ In *Fisher v. United States*, 425 U.S. 391, 409-10, 48 L. Ed. 2d 39, 55-56, 96 S. Ct. 1569, 1580-81 (1976), the United States Supreme Court explained the scope of the fifth amendment privilege against self-incrimination as follows:

"[T]he privilege protects a person only against being incriminated by his own compelled testimonial communications. ***

The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, wholly aside from the contents of the papers produced. Compliance with the subpoena tacitly concedes the existence of the papers demanded and their possession or control by the [witness]. It also would indicate the [witness's] belief that the papers are those described in the subpoena. [Citation.] The elements of compulsion are clearly present, but the more difficult issues are whether the tacit averments of the [witness] are both 'testimonial' and 'incriminating' for purposes of applying the [f]ifth [a]mendment."

The Court in *Fisher* determined that a taxpayer's implicit admission regarding the existence and possession of his accountant's papers did not rise to the level of testimony protected by the fifth amendment privilege because "[t]he existence and location of the papers [was] a foregone conclusion." *Fisher*, 425 U.S. at 411, 48 L. Ed. 2d at 56, 96 S. Ct. at 1581.

In a recent decision, however, *United States v. Hubbell*, 530 U.S. 27, 36, 147 L. Ed. 2d 24, 36, 120 S. Ct. 2037, 2043 (2000), the United States Supreme Court more restrictively viewed its holding in *Fisher* as tied to the particular circumstances of that case—namely, the compulsory production of documents otherwise required by tax law to have been previously prepared. In language applicable to the present case, the Court explained the scope of fifth amendment protection as follows:

"[This Court has made clear] that the act of producing documents in response to a subpoena may have a compelled testimonial aspect. We have held that 'the act of production' itself may implicitly communicate 'statements of fact.' By 'producing documents in compliance with a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic.' " *Hubbell*, 530 U.S. at 36, 147 L. Ed. 2d at 36, 120 S. Ct. at 2043, quoting *Doe v. United States*, 487 U.S. 201, 209, 101 L. Ed. 2d 184, 196, 108 S. Ct. 2341, 2347 (1988).

■ Thus, in the present case, compulsion exists because the trial court (1) ordered Christopher to turn over any recordings, (2) found him in contempt, and (3) sentenced him to jail until he complied with the order. Turning over any recordings would amount to compelled testimonial communication because that act would implicitly concede

the existence, source, and authenticity of the materials. *Hubbell*, 530 U.S. at 36, 147 L. Ed. 2d at 36, 120 S. Ct. at 2043; see also *Briggs v. Salcines*, 392 So. 2d 263, 267 (Fla. App. 1980) (holding that if tape recordings of telephone conversations were in a witness's possession, "the forced production of them would amount to compelled incriminating testimonial communication in that the production would serve as authentication that [the witness] had made the tape recordings"). That act would also be incriminating because the recorded conversations, if any, would have been knowingly and intentionally obtained by an eavesdropping device in violation of Illinois criminal law (see 720 ILCS 5/14—2(a)(1) (West 2000) (one commits eavesdropping by knowingly and intentionally using an eavesdropping device for the purpose of hearing or recording all or any part of any conversation)).

In support of our conclusion in this case, we quote from Justice Thomas' concurring opinion in *Hubbell*, as follows:

"[T]his Court has noted that, for generations before the framing, 'one cardinal rule of the court of chancery [was] never to decree a discovery which might tend to convict the party of a crime.' *Boyd v. United States*, 116 U.S. 616, 631[, 29 L. Ed. 746, 751, 6 S. Ct. 524, 533] (1886). See also *Counselman v. Hitchcock*, 142 U.S. 547, 563-64[, 35 L. Ed. 1110, 1114, 12 S. Ct. 195, 198] (1892) ('It is an ancient principle of the law of evidence, that a witness shall not be compelled, in any proceeding, to make disclosures or to give testimony which will tend to criminate him or subject him to fines, penalties[,] or forfeitures')." *Hubbell*, 530 U.S. at 51-52, 147 L. Ed. 2d at 45, 120 S. Ct. at 2051 (Thomas, J., concurring, joined by Scalia, J.).

Christopher asserted a valid fifth amendment privilege against self-incrimination, and the trial court erred by (1) ordering him to turn over the recordings, and (2) holding him in indirect civil contempt for willfully refusing to comply with that order.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's order that Christopher turn over the tape recordings, vacate the court's order finding Christopher in indirect civil contempt, and remand for further proceedings not inconsistent with this order.

Reversed in part and vacated in part; cause remanded for further proceedings.

KNECHT, J., concurs.

JUSTICE COOK, dissenting:

I respectfully dissent and would affirm the decision of the trial

court. The majority opinion fails to address the special rules which apply when the fifth amendment is sought to be exercised in a civil case.

The interests of fundamental fairness and substantial justice outweigh the protections afforded by a privilege where plaintiff seeks to utilize those protections as a sword (rather than a shield) to prevent disclosure of relevant, probative, admissible, and not unduly prejudicial evidence. *D.C. v. S.A.*, 178 Ill. 2d 551, 570, 687 N.E.2d 1032, 1041 (1997) (therapist-recipient relationship). *D.C.* cited *Galante v. Steel City National Bank of Chicago*, 66 Ill. App. 3d 476, 481, 384 N.E.2d 57, 61 (1978), where the court noted that a number of jurisdictions have overwhelmingly rejected the contention that a plaintiff in a civil action may invoke the fifth amendment privilege against self-incrimination while still maintaining the lawsuit. See also *In re Marriage of Kocher*, 282 Ill. App. 3d 655, 659, 668 N.E.2d 651, 654 (1996) (where we refused to allow a party to put in his financial affidavits as evidence when he asserted the fifth amendment in response to questions concerning them). See also *In re Marriage of Hartian*, 172 Ill. App. 3d 440, 453, 526 N.E.2d 1104, 1113 (1988) ("We find that once Marie filed her [petition for attorney fees] beneficial to herself, she 'became an actor, a profiteer of the judicial machinery and process' [citation] ***").

It is the prevailing rule that the fifth amendment does not forbid adverse inferences against parties in civil actions when they refuse to testify in response to probative evidence offered against them. *People v. $1,124,905 U.S. Currency & One 1998 Chevrolet Astro Van*, 177 Ill. 2d 314, 332, 685 N.E.2d 1370, 1379 (1997), quoting *Baxter v. Palmigiano*, 425 U.S. 308, 318, 47 L. Ed. 2d 810, 821, 96 S. Ct. 1551, 1558 (1976); *Jacksonville Savings Bank v. Kovack*, 326 Ill. App. 3d 1131, 1137, 762 N.E.2d 1138, 1143 (2002) (stay of civil case not appropriate where defendant not charged and merely asserted he was the subject of a criminal investigation).

In the present case, the trial court had the right to ask Christopher whether he had the tapes, and when Christopher invoked the fifth amendment privilege, the trial court had the right to draw the negative inference that Christopher in fact had the tapes. The court was then entitled to take steps to secure the tapes.

The majority relies on *Hubbell*, 530 U.S. at 36, 147 L. Ed. 2d at 36, 120 S. Ct. at 2043, where an indictment against Webster Hubbell was dismissed because the evidence the government proposed to use against him was derived from the testimonial aspect of Hubbell's immunized conduct in previously producing subpoenaed documents. The question before us, whether the tapes must be turned over, is not the question addressed in *Hubbell*. Whether Christopher's acts in turning

over the tapes may be used against him in some future proceeding (the issue in *Hubbell*) is not an issue in this case.

A case more on point is *Baltimore City Department of Social Services v. Bouknight*, 493 U.S. 549, 107 L. Ed. 2d 992, 110 S. Ct. 900 (1990), where a mother was ordered to produce her missing child and when she refused to do so was found in contempt and imprisoned until she complied with the court order. The Supreme Court rejected the mother's contention that the contempt order violated her privilege against self-incrimination. "When a person assumes control over items that are the legitimate object of the government's noncriminal regulatory powers, the ability to invoke the privilege is reduced." *Bouknight*, 493 U.S. at 558, 107 L. Ed. 2d at 1002, 110 S. Ct. at 906; see also *Sanders v. Shephard*, 185 Ill. App. 3d 719, 733, 541 N.E.2d 1150, 1159 (1989) (father found in contempt and imprisoned until he produced child). The child in *Bouknight* was the particular object of the State's regulatory interests (*Bouknight*, 493 U.S. at 559, 107 L. Ed. 2d at 1002-03, 110 S. Ct. at 907).

*If* there is a prosecution of Christopher for a violation of the eavesdropping statute, and *if* the prosecution seeks to use the turnover of the tapes or evidence derived therefrom, Christopher may not be without a remedy. "We are not called upon to define the precise limitations that may exist upon the [s]tate's ability to use the testimonial aspects of Bouknight's act of production in subsequent criminal proceedings. But we note that imposition of such limitations is not foreclosed." *Bouknight*, 493 U.S. at 561, 107 L. Ed. 2d at 1004, 110 S. Ct. at 908. The attractive and apparently practical course of subsequent use restriction is not appropriate where a significant element of the regulatory requirement is to aid law enforcement, but that was not the case in *Bouknight*. *Bouknight*, 493 U.S. at 562, 107 L. Ed. 2d at 1004, 110 S. Ct. at 908-09, quoting *Marchetti v. United States*, 390 U.S. 39, 58-59, 19 L. Ed. 2d 889, 903-04, 88 S. Ct. 697, 708 (1968).

Christopher's conduct, spying on his wife, is of particular governmental concern. His conduct, stalking, keeping his wife under surveillance, constitutes "harassment" and "domestic violence" under the Illinois Domestic Violence Act of 1986 (750 ILCS 60/103(1), (3), (7) (West 2000)). The legislature has directed that we recognize domestic violence as a serious crime against the individual and society which produces family disharmony in thousands of Illinois families and promotes a pattern of escalating violence which frequently culminates in intrafamily homicide. 750 ILCS 60/102(1) (West 2000). Christopher's spying on his wife might enable him to determine when she would be alone or in other situations where she would be susceptible to attack. The trial court did not have to tolerate Christopher's continued pos-

session and use of the tapes. The trial court has the power to direct respondent to promptly make personal property available to petitioner if "sharing it would risk abuse of petitioner by respondent." 750 ILCS 60/214(b)(10) (West 2000).