**In re Frank P. HYDE, Debtor.**

**Bankruptcy No. 95 B 22385(ASH).**

United States Bankruptcy Court, S.D. New York.

June 16, 1998.

**216**

Todtman, Young, Nachamie, Hendler & Spizz, P.C. by Alex Spizz, Barton Nachamie, Richard S. Kanowitz, New York City, for debtor.

Steinberg Fineo & Burlant P.C. by Heath S. Berger, Garden City, NY, for Alan J. Helfand.

### DECISION DENYING MOTION TO QUASH RULE 2004 SUBPOENA

ADLAI S. HARDIN, Jr., Bankruptcy Judge.

By this motion the debtor seeks to block disclosure to the Chapter 7 Trustee of certain of his business records which he had turned over to attorneys retained to represent him in possible criminal investigations. The motion raises significant issues in the application of the Fifth Amendment and presents a point of sharp conflict between important societal values imbedded in the statutory and common law obligation to make full disclosure necessary to secure the rights of others, on the one hand, and the Constitutional prohibition of compelled testimony against oneself in criminal cases, on the other. Because the documents are not protected by the attorney-client privilege, and production of the documents would not constitute an incriminating testimonial act implicating the Fifth Amendment privilege against self-incrimination, the motion is denied.

### Background[1]

Prior to coming to the United States, the debtor lived in Australia where he became a tax agent (Tr. 11). After coming to this country, he continued to educate himself and became a licensed accountant (Tr. 10, 11). The debtor organized a professional corporation known as "Frank Hyde, P.C." in January 1996 (Tr. 12). The purpose of Frank Hyde, P.C. was to perform the same "accounting services" as the debtor provided

---

1. The facts set forth in this section are based primarily upon the transcript of the debtor's deposition taken on February 20, 1997 by counsel for the Chapter 7 Trustee. The deposition tran-

script is annexed to the Trustee's Affirmation in Opposition to the motion as Exhibit B and will be referred to herein as the "Transcript" or "Tr."

before under his own name, Frank P. Hyde (*id.*). After he converted his accounting practice to Frank Hyde, P.C., the debtor continued to provide the same services to substantially the same clients (Tr. 12, 13).

In addition to his accounting practice, the debtor also carried on a separate business under the name "Finax Trading" ("Finax"). The debtor had separate checking accounts for his separate businesses, to wit, Frank P. Hyde accountant, Frank Hyde, P.C. and Finax Trading (Tr. 14–15). In his bankruptcy schedules the debtor listed an asset called "Finax Trading Loans" with an unknown value (Tr. 13–14). These were loans, apparently or purportedly secured by mortgages, which were advanced under the name of Finax (Tr. 14). The debtor could not provide information concerning the Finax Trading Loans or the sources of funds therefor without reference to the Finax Documents which are the subject of the instant motion (Tr. 17, 18, 21, 24, 26–27, 28–29, 30, 32). Finax was not a corporation or an entity of any kind at any relevant time,[2] but was described by the debtor as "a sole ownership" which was operated by the debtor alone without the assistance of any employee (Tr. 14). For tax purposes, Finax was included on Schedule C on the debtor's personal income tax return, separately from his accounting profession (Tr. 16). The debtor answered "no" to the question whether he was holding himself out as an investment professional with respect to the money that he took in for Finax Trading (Tr. 18). He invoked his Fifth Amendment privilege in response to the question "How did money come into Finax Trading?" (Tr. 18–19), but he testified that "maybe 30" people invested in Finax. Trading Loans, and that these were people for whom the debtor acted as their personal accountant (Tr. 19).

At some unspecified time prior to July 1, 1996, the debtor retained the law firm of Newman & Schwartz "to render professional legal services to him [the debtor] in connection with possible criminal investigations into the genesis, ownership and operations of, and his relationship to, Finax" (Applica-

tion in Support of Motion, Ex. B). Newman & Schwartz retained a certified public accountant named Neil Roth "to assist us [Newman & Schwartz], work under our direction and report to us," and to "perform such expert accounting services for us as we may request which are of a character and quality necessarily adjunct to the professional legal services we are obliged to perform for [the debtor]" (*id.*). The debtor delivered possession of all of his books and records concerning Finax (the "Finax Documents" or "Documents") to Newman & Schwartz, and Newman & Schwartz delivered possession of the Finax. Documents to Neil Roth. The debtor retained possession of all of his books and records for Frank Hyde, P.C. and Frank P. Hyde accountant, and at the time of his February 20, 1997 deposition those books and records were at his house (Tr. 11, 46).

### The Rule 2004 Order and Subpoena

On December 13, 1995 an involuntary petition under Chapter 11 of the Bankruptcy Code was filed in this Court against the debtor. On March 1, 1996 an order for relief was entered on the debtor's consent. At the Section 341(a) meeting the debtor testified on April 24 and May 29, 1996, asserting his Fifth Amendment privilege against self-incrimination on certain questions. On June 19, 1996, after notice and a hearing, the Court granted the United States Trustee's motion and entered an order converting the debtor's Chapter 11 case to Chapter 7. In September 1996 Alan J. Helfand, Esq. was elected Chapter 7 Trustee.

On January 9, 1997 this Court issued an *ex parte* order pursuant to Bankruptcy Rule 2004 authorizing counsel for the Trustee to issue a subpoena to the debtor calling for his testimony and production of documents relating to the assets, liabilities, financial affairs, real property, deeds, mortgages, closing statements, leases, tax returns, books and records of the debtor. On February 3, 1997 the debtor was served with a subpoena for a Rule 2004 examination and production of documents. The debtor appeared for his exami-

---

**2.** Finax was a partnership in the 1960s, but it was dissolved, apparently before any time relevant to the debtor's bankruptcy (Tr. 15–16).

nation on February 20, 1997 with his counsel, but failed to supply any of the requested documents. Subsequently, it appears that the debtor's counsel agreed to provide all of the debtor's documents called for by the subpoena except the debtor's books and records relating to Finax Trading.

The instant motion arises out of a Rule 2004 order signed by this Court on February 19, 1997 calling for examination of and document production by Neil Roth, to whose possession and custody the Finax Documents had been delivered. Pursuant to the February 19 Rule 2004 order, the Trustee's counsel issued a subpoena dated March 18, 1997 to Neil Roth (the "Roth subpoena") calling for production of "All books and records currently in your possession in regard to Frank P. Hyde, Frank P. Hyde, P.C. or Finax."

### The Motion to Quash

Although the instant application seeks to quash the entire Roth subpoena, it appears that the debtor has produced or agreed to produce all documents sought by the Chapter 7 Trustee other than the Finax Documents, or certain of the Finax. Documents, which were turned over to Neil Roth. The debtor asserts three grounds in support of the motion to quash:

(1) The subpoena is unreasonably broad in scope and, therefore, burdensome.

(2) Production of the Finax Documents, which were delivered to the debtor's counsel and are in possession of an accountant hired by counsel, would "chill" the attorney-client privilege.

(3) Production of the Finax Documents would violate the debtor's Fifth Amendment privilege against self-incrimination.

Each of these grounds will be considered in the discussion below.

### Analysis and Conclusions

#### Over-Broad, Burdensome

The debtor objects that the subpoena calling for "all books and records currently in your possession in regard to ... Finax," is "'too sweeping in its terms to be regarded as reasonable,' and lacking particularity, the Subpoena violates the Fourth Amendment and the New York Constitution's analog," citing two New York State court decisions (Application 8, 9). Because the Roth subpoena is so broad, "enforcement of the Subpoena would be likely to cause production of documents which, wholly or in part, the Trustee either already possesses or is not seeking" (*id.* at 5). Asserting that compliance with the subpoena would compel Neil Roth "to become informed about the process that would necessarily involve discussion with the Debtor," the debtor argues:

In these circumstances, the Subpoena becomes unenforceable because on its face it does not seek specified documents, subject to easy identification, assembly and production by a custodian acting in a merely ministerial or clerical capacity. Mr. Roth cannot resolve the ambiguity inherent in the term "all books and records ... in regard to" the Debtor and the named corporations (*id.* at 10).

In the context of this bankruptcy case, these contentions border on the frivolous.

First, even if it would be burdensome and difficult for Neil Roth or the debtor to comply with a request for "all books and records ... of Finax," this would not be a valid objection to the obligation to produce documents by a debtor who is subject to the protections and processes of the Bankruptcy Code and Rules. The Finax Documents are no longer the personal property of Frank Hyde. Under Section 541 of the Bankruptcy Code the Finax Documents are property of the debtor's estate, and Section 542 of the Bankruptcy Code requires that they be turned over to the Chapter 7 Trustee, regardless of the burden. Section 542(e) provides that, subject to any applicable privilege,

the Court may order an attorney, accountant, or other person that holds recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs, to turn over or disclose such recorded information to the trustee.

Section 521(4) mandates that, if a trustee is serving in the case,

The debtor shall—... (4) ... surrender to the trustee all property of the estate

and any recorded information, including books, documents, records, and papers, relating to property of the estate, whether or not immunity is granted under section 344 of this title.

▰ The obligation of full disclosure is crucial to the integrity of the bankruptcy process. *See In re Wincek,* 202 B.R. 161, 166 (Bankr.M.D.Fla.1996) (" '[F]ull disclosure of all relevant information has always been an important policy of the bankruptcy laws.' ... If a debtor refuses to answer questions on the basis of his Fifth Amendment rights, the 'bankruptcy court's ability to effect a thorough and equitable adjudication is jeopardized.' "); *see also Matter of M4 Enterprises, Inc.,* 190 B.R. 471, 474 (Bankr. N.D.Ga.1995) (applying the same obligations to trustees, noting "[t]o completely forbid pursuit of a Rule 2004 examination of the Trustee under such justification would substantially contravene the policy behind the Rule and compromise bankruptcy's general predilection for open-aired examination.") *In re International Horizons, Inc.,* 689 F.2d 996, 1005–06 (11th Cir.1982) (refusing to apply a Georgia accountant client privilege in bankruptcy proceedings, noting that the "[a]pplication of an accountant-client privilege in federal bankruptcy proceedings would deny courts and creditors access to a vital source of information relating to a debtor's assets and liabilities ... undermin[ing] the important federal interest in providing bankruptcy courts and creditors with complete and accurate information regarding a debtor's financial condition."). As to the breadth and lack of specificity of the subpoena, the short answer is that the courts have repeatedly held that discovery under Bankruptcy Rule 2004 is so broad and wide-ranging as to authorize a "fishing expedition," and the scope of discovery available in the Bankruptcy Court is not limited by constraints that may be applicable in the more familiar contours of discovery under the Federal Rules of Civil Procedure. *In re Johns–Manville Corp.,* 42 B.R. 362, 364 (S.D.N.Y.1984) (Rule 2004 "contemplates a broad and far-reaching inquiry, even a 'fishing expedition' ..."); *In re Bennett Funding Group, Inc.,* 203 B.R. 24, 28 (Bankr.N.D.N.Y.1996) ("The scope of this examination is admittedly 'un-fettered and broad' ... and indeed is commonly recognized as more in the nature of a 'fishing expedition.' "); *In re Drexel Burnham Lambert Group, Inc.,* 123 B.R. 702, 711 (Bankr.S.D.N.Y.1991) ("It can be legitimately compared to a fishing expedition."); *In re Vantage Petroleum Corp.,* 34 B.R. 650, 651 (Bankr.E.D.N.Y.1983) ("The exploration can be in the nature of a fishing expedition.").

▰ Second, in the context of this case the request for "all books and records in regard to ... Finax" is, in fact, quite precise. From the debtor's Rule 2004 testimony, it relates to documents of whatever sort maintained by the debtor in connection with a finite universe of the debtor's transactions doing business as Finax Trading with approximately thirty persons who loaned or invested money with the debtor for the purpose of investing in mortgage transactions. The Finax Documents go to the very heart of this Chapter 7 case and are essential for tracing and ascertaining the assets and liabilities of the debtor's estate, including not only the Finax Trading Loans but payments which may be recoverable under Sections 547 or 548 of the Bankruptcy Code or under state fraudulent conveyance law.

Third and finally, the suggestion that the task of assembling and producing the Finax Documents would be "burdensome" on anybody is simply nonsense. As shown below, the debtor testified repeatedly at his Rule 2004 examination on February 20, 1997 that he collected all of the Finax Documents and delivered them to his attorneys and, through the attorneys, to Neil Roth, who is presently the custodian of all of the Finax Documents. In fact, it has been represented by debtor's counsel that all of the Finax. Documents are sitting in boxes in this Court's chambers awaiting determination of this motion. Compliance with the Roth subpoena will involve nothing more burdensome than the delivery of these boxes to a location where they may be examined and copied by counsel for the Chapter 7 Trustee.

### *Attorney–Client Privilege*

▰ Little need be said of the debtor's attorney-client privilege argument. Most significant, there is no claim that any of the

Finax Documents is privileged. Rather, the debtor's contention is that

> enforcement of the subpoena will unnecessarily chill the attorney-client relationship, particularly since the Chapter 7 trustee has made no showing of need to obtain all records in Mr. Roth's possession. (Application 11, heading)

■ As regards a showing of need, for the reasons and under the authorities discussed above, a debtor's obligation of full disclosure is so broad under the Bankruptcy Code and Bankruptcy Rule 2004 that discovery under Rule 2004 has been acknowledged by the courts as permitting a "fishing expedition." While there obviously are bounds to the right of a party in interest to probe into a debtor's private, personal affairs, the burden rests more with the debtor to show irrelevance and impertinence of a particular document request than on a creditor or Chapter 7 trustee to show particularized need for disclosure. *See, e.g., In re Vantage Petroleum Corp.,* 34 B.R. at 652 (where documents requested sufficiently relate to the debtor or the administration of the estate, burden is on movant to show that trustee's request would be oppressive or burdensome). But even if lack of need were a bar to production of non-privileged documents, in this case the debtor's contention is without merit, because there can be no question as to the relevance of the Finax Documents and the Chapter 7 Trustee's need for those Documents. The debtor's own testimony at his Rule 2004 examination demonstrated repeatedly that the Finax Documents are essential to determine the assets and liabilities of this estate.

The purported chilling influence of enforcing the subpoena on the attorney-client relationship is articulated thusly in the debtor's Application:

> 22. The immediate impact of enforcing the Subpoena is the creation of a potential conflict of interest between the Debtor and his counsel. "The serving of a subpoena under such circumstances will immediately drive a chilling wedge between the attorney/witness and his client." *U.S. v. Klubock,* 832 F.2d 649, 653 (1st Cir.1987). As a witness, the attorney and his agents have separate legal and practical interests from

those of the client. These interests may or may not coincide with their interests as counsel for the client.... These kinds of implications have lead other courts to require prior judicial approval before the issuance of a subpoena [citing *Klubock* ].

The issue in *Klubock* was "whether a district court can adopt a local rule which requires prosecutors to seek prior judicial approval before serving a grand jury subpoena upon an attorney, for the purpose of obtaining evidence about the attorney's clients." 832 F.2d at 650. Reasoning that compelling an attorney *to testify* concerning a client might infringe upon the attorney-client privilege and thereby undermine the attorney-client relationship, the Court of Appeals sustained the local rule, stating that "[a] minimal overview by an impartial observer, as is provided by PF 15, can go far in preventing the creation of these ethical conflicts between the attorney/witness and his client." 832 F.2d at 653. The *Klubock* case is not germane here because the debtor's motion to quash concerns neither a court rule of general application nor a specific invasion or potential invasion of the attorney-client privilege.

■ The Roth subpoena commands Neil Roth to produce *documents* of the debtor. Simply stated, it is unthinkable that any party should have it within his power to shield documents which do not themselves constitute or embody privileged attorney/client communications by the simple expedient of placing his documents in the custody of his attorney or his attorney's employees or independent contractors. No case or other authority supports such a radical proposition, and he decisions which have addressed the question reject any such argument. *See, e.g., Fisher v. United States,* 425 U.S. 391, 403–404, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976) (hereinafter *"Fisher "*), where the Supreme Court said:

> This Court and the lower courts have thus uniformly held that pre-existing documents which could have been obtained by court process from the client when he was in possession may also be obtained from the attorney by similar process following transfer by the client in order to obtain

more informed legal advice. [citations omitted]

Also inapposite is the debtor's citation of *United States v. Kovel,* 296 F.2d 918 (2d Cir.1961). The *Kovel* case, which the debtor cites for the proposition that "communications to an accountant, in confidence, for the purpose of obtaining legal advice from a lawyer are protected by the attorney-client privilege", may become relevant if Neil Roth were called upon to give testimony invading the attorney-client privilege. But the case is not germane to the question whether the debtor may shield his documents from scrutiny by delivering them to his criminal attorneys and their forensic accountant. If Neil Roth is called upon to give testimony, the attorney-client privilege may be invoked in response to particular questions, if any, which would invade the privilege. Neither *Kovel* nor any other case permits a party to hide unprivileged documents by giving them to his attorney or forensic accountant.

### Fifth Amendment Privilege

The Fifth Amendment to the United States Constitution provides, in relevant part, that "No person ... shall be compelled in any criminal case to be a witness against himself...." Over its long history in the law this provision has given rise to countless decisions, often inconsistent, reflecting evolutionary changes in Constitutional thought. For example, *compare Boyd v. United States,* 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886) with *Fisher,* 425 U.S. at 405, 96 S.Ct. 1569 *et seq.* and Justice O'Connor's concurrence in *United States v. Doe,* 465 U.S. 605, 618, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984) (hereinafter *"Doe"*) ("The notion that the Fifth Amendment protects the privacy of papers originated in *Boyd v. United States* [citations omitted] but our decision in Fisher v. United States [citations omitted] sounded the death knell for Boyd."). The courts have expanded the privilege against self-incrimination beyond the literal language of the Fifth Amendment in a number of respects, provoking widespread and far-reaching commen-

tary, often critical. *See, e.g.,* Akhil Reed Amar, Renee B. Lettow, *Fifth Amendment First Principles: The Self–Incrimination Clause,* 93 Mich.L.Rev. 857–858 (1995) ("The Self–Incrimination Clause of the Fifth Amendment is an unsolved riddle of vast proportions, a Gordian note in the middle of our Bill of Rights. From the beginning it lacked an easily identifiable rationale; in 1789, the words of the Clause were more a slogan than a clearly defined legal rule, and in the preceding four centuries the slogan had stood for at least four different ideas. Today, things are no better: the Clause continues to confound and confuse. Because courts and commentators have been unable to deduce what the privilege is for, they have failed to define its scope in the most logical and sensible way"); Raymond G. Keenan, *To Act or Not? That Is the Question: Self–Incrimination and the Sole Proprietor,* 13 Touro L.Rev. 265 (1996); Robert P. Mosteller, *Simplifying Subpoena Law; Taking the Fifth Amendment Seriously,* 73 Va.L.Rev. 1 (1987); Frederick P. Hafetz, Roger Parloff, *Documents, Subpoenas and Fifth Amendment Privilege,* 137 P.L.I./Crim. 9 (1985), Craig M. Bradley, *Constitutional Protection for Private Papers,* 16 Harv.C.R.–C.L.L.Rev. 461 (1981).

The potential for controversy and conflict between competing policy considerations is acute in the context of bankruptcy, which pits a debtor's Fifth Amendment right to remain mute against his obligation of full and honest disclosure which is the predicate of his right to a discharge and which is essential to the fair administration of the bankruptcy laws. The problem is compounded by Section 727(a)(6)(C) of the Bankruptcy Code, under which a debtor would be entitled to a discharge despite his refusal to respond or testify if his refusal was based upon "the properly invoked privilege against self-incrimination." *See* the analysis in *In re Connelly,* 59 B.R. 421 (Bankr.N.D.Ill.1986).[3]

---

**3.** Under the Bankruptcy Act, a debtor could be denied a discharge for exercising his Fifth Amendment rights. Section 14(c)(6) of the Act, 11 U.S.C. § 32(c)(6) (repealed 1979) denied the debtor a discharge for any refusal to answer a material question approved by the Court, even if the refusal was based upon the privilege against self-incrimination. *See Connelly,* 59 B.R. at 429, footnote 11.

Fortunately, the legal principles necessary for decision in this case, while far from uncontroversial, are relatively simple and are set forth as definitive, controlling precedent in the leading Supreme Court decision in *Fisher*, as well as the Court's subsequent decisions in *Doe* and *Baltimore City Dep't of Social Services v. Bouknight*, 493 U.S. 549, 110 S.Ct. 900, 107 L.Ed.2d 992 (1990) (hereinafter, *"Bouknight"*). In the *Fisher* case (actually, two cases), after meeting with Internal Revenue agents the taxpayers transferred documents to their lawyers retained to assist them in connection with the IRS investigation. Upon learning of the whereabouts of the documents, the Internal Revenue Service served summonses on the attorneys directing them to produce the documents. The Supreme Court framed the issue presented as "whether a summons directing an attorney to produce documents delivered to him by his client in connection with the attorney-client relationship is enforceable over claims that the documents were constitutionally immune from summons in the hands of the client and retained that immunity in the hands of the attorney." *Fisher*, 425 U.S. at 393, 96 S.Ct. 1569. The Supreme Court ruled that compliance with a summons directing the taxpayer in each case to produce the documents, which had been delivered to lawyers, would involve no incriminating testimony within the protection of the Fifth Amendment and, accordingly, ruled that the summonses directed to the taxpayers' attorneys were enforceable.

It is instructive in this case to summarize the analysis employed by the Supreme Court in *Fisher*. The Court began by noting that the taxpayer's Fifth Amendment privilege against self-incrimination would not be violated by a summons directed to the taxpayer's lawyer because such a summons would not "compel" the taxpayer to be a "witness" against himself or, indeed, to do anything. The Court said:

> The taxpayer's privilege under this Amendment is not violated by enforcement of the summonses involved in these cases because enforcement against a taxpayer's lawyer would not "compel" the taxpayer to do anything—and certainly would not compel him to be a "witness" against himself. The Court has held repeatedly that the

Fifth Amendment is limited to prohibiting the use of "physical or moral compulsion" exerted on the person asserting the privilege [citations omitted]. In *Couch v. United States* [409 U.S. 322, 93 S.Ct. 611, 34 L.Ed.2d 548 (1973)], we recently ruled that the Fifth Amendment rights of a taxpayer were not violated by the enforcement of a documentary summons directed to her accountant and requiring production of the taxpayer's own records in the possession of the accountant. We did so on the ground that in such a case "the ingredient of personal compulsion against an accused is lacking."

> Here, the taxpayers are compelled to do no more than was the taxpayer in *Couch*. The taxpayers' Fifth Amendment privilege is therefore not violated by enforcement of the summonses directed toward their attorneys. *This is true whether or not the Amendment would have barred a subpoena directing the taxpayer to produce the documents while they were in his hands.*

*Fisher*, 425 U.S. at 397, 96 S.Ct. 1569, emphasis supplied.

> Our above holding is that *compelled production of documents from an attorney does not implicate whatever Fifth Amendment privilege the taxpayer might have enjoyed from being compelled to produce them himself.*

*Id.* at 402, 96 S.Ct. 1569, emphasis supplied.

Despite the underscored language (recognizing its implications for the attorney-client relationship), the Supreme Court went on to express agreement with the apparently contrary proposition that an attorney would not be required to produce documents if the client himself would be privileged from production as exempt from self-incrimination. *See id.* at 404–405, 96 S.Ct. 1569. The Court proceeded "to the question whether the documents could have been obtained by summons addressed to the taxpayer while the documents were in his possession." *Id.* at 405, 96 S.Ct. 1569. After a lengthy analysis trenching on the authority of its early decision in *Boyd v. United States, supra* (*see Fisher*, 425 U.S. at 405–408, 96 S.Ct. 1569), the Court made the statement, central to this case, that

the Fifth Amendment "applies only when the accused is compelled to make a *testimonial* communication that is incriminating." *Id.* at 408, 96 S.Ct. 1569, emphasis in original. The Court then turned "to the question of what, if any, incriminating testimony within the Fifth Amendment's protection, is compelled by a documentary summons." *Id.* at 409, 96 S.Ct. 1569.

Before turning to the testimonial elements of the act of production, the Supreme Court made two other points of signal importance in this case. First, the fact that the documents themselves contain incriminating information would not implicate the Fifth Amendment privilege, because the issue is not what the documents communicate but what the act of production communicates. Since the act of production would not

> ordinarily compel the taxpayer to restate, repeat, or affirm the truth of the contents of the documents sought ... *the Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate the taxpayer,* for the privilege protects a person only against being incriminated by his own compelled testimonial communications.... The taxpayer cannot avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing, whether his own or that of someone else.

*Id.* at 409, 410, 96 S.Ct. 1569, emphasis supplied. Second, as presaged in the last clause of the foregoing quotation ("whether his own or that of someone else"), the fact that the documents subpoenaed were written or prepared by the person asserting the privilege is irrelevant. As stated by the Court:

> The fact that the documents may have been written by the person asserting the privilege is insufficient to trigger the privilege [citations omitted].... [T]he fact that [the documents were] written by him is not controlling with respect to the Fifth Amendment issue.... In the case of a documentary subpoena the only thing compelled is the act of producing the document and the compelled act is the same as the

one performed when a chattel or document not authored by the producer is demanded. *Id.* at 410, footnote 11.

The Court then turned to the potentially testimonial aspects of compelled production, identifying three such aspects:

> The act of producing evidence in response to a subpoena nevertheless has communicative aspects of its own, *wholly aside from the contents of the papers produced.* Compliance with the subpoena tacitly concedes the [1] *existence* of the papers demanded and their [2] *possession or control* by the taxpayer. It also would indicate the taxpayer's belief that [3] *the papers are those described in the subpoena.*

*Id.* at 410, 96 S.Ct. 1569, emphasis and bracketed numbers supplied. The Court went on in the same paragraph to reemphasize two points previously made. To implicate the Fifth Amendment, the act of production must be *both* testimonial *and* incriminating. Further, this two-fold test must be met without regard to the incriminating content of the documents ("wholly aside from the contents of the papers produced," *id.*), since the incriminating communication must be found in the act of production, rather than in the documents themselves. The Court said:

> The elements of compulsion are clearly present, but the more difficult issues are whether the tacit averments of the taxpayer are both "testimonial" and "incriminating" for purposes of applying the Fifth Amendment.... *[H]owever incriminating the contents of the accountant's workpapers might be, the act of producing them* —the only thing which the taxpayer is compelled to do—*would not itself involve testimonial self-incrimination.*

*Id.* at 410–411, 96 S.Ct. 1569, emphasis supplied.

One final point of instruction must be taken from the *Fisher* case. Where the existence and location of the documents sought to be subpoenaed "are a *foregone conclusion* and the taxpayer adds little or nothing to the sum total of the Government's information by conceding that he in fact has the papers[,]" then under these circumstances "by enforcement of the summons 'no constitutional

rights are touched. The question is not of testimony but of surrender.'" *Id.* at 411, 96 S.Ct. 1569, emphasis supplied, quoting the decision of Justice Holmes *In re Harris,* 221 U.S. 274, 279, 31 S.Ct. 557, 55 L.Ed. 732 (1911).[4]

A number of cases since *Fisher* appear to have taken a different view of the act of production doctrine, by conflating the incriminating content of the documents produced, with the act of production which is not itself incriminating, in order to satisfy the "both testimonial and incriminating" test. *See, e.g., U.S. v. Fox,* 721 F.2d 32, 40 (2d Cir.1983) (remanding for an examination of whether summoned documents were incriminatory); *In re Grand Jury Subpoena Duces Tecum April 23, 1981,* 657 F.2d 5 (2d Cir.1981) (examining contents of documents to determine whether personal papers privilege would apply); *Katz v. U.S.,* 623 F.2d 122 (2d Cir.1980) (implicitly examines contents to determine incrimination); *Butcher v. Bailey,* 753 F.2d 465 (6th Cir.1985) (remanding for an examination of the contents of subpoenaed material, although recognizing the severely limited ambit of the privilege in light of *Fisher* and *Doe* ); *U.S. v. Freidus,* 135 F.R.D. 52 (S.D.N.Y.1991) (examining contents of personal versus business related papers).[5] Cases such as these appear to proceed analytically to identify the testimonial aspects of the act of production, and then examine or call for examination of the incriminating contents of the documents to be produced in order to determine if there is incrimination. Such analysis cannot be

squared with the *Fisher* decision as it is written.

■ If the requirement of a "testimonial communication that is incriminating," *Fisher,* 425 U.S. at 408, 96 S.Ct. 1569, and the "both testimonial and incriminating" test, *id.* at 410, 96 S.Ct. 1569, could be met by a showing that the documents to be produced are incriminating, then the rule would be quite simple: since the act of production is always testimonial in some respect, the Fifth Amendment would always forbid compelled production of any sort of incriminating evidence, and the only issue would be whether the contents of the documents to be produced were incriminating. But *Fisher* refutes such a rule. The Supreme Court said "[i]t is also clear that the Fifth Amendment does not independently proscribe the compelled production of every sort of incriminating evidence...." *Id.* at 408, 96 S.Ct. 1569. The Court's analysis of what constitutes an incriminating testimonial communication, including the "both testimonial and incriminating" test, is immediately preceded by the language "wholly aside from the contents of the papers produced." *Id.* at 410, 96 S.Ct. 1569. On the same page, the Court said "[t]he taxpayer cannot avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing...." *Id.* The Court concluded that the privilege could not be invoked by the taxpayers in *Fisher* "however incriminating the contents of the accountant's workpapers might be," because "the act of producing them—the only

---

4. The full quotation from *In re Harris,* a bankruptcy case, is as follows:

> [N]o Constitutional rights are touched. The question is not of testimony but of surrender—not of compelling the bankrupt to be a witness against himself in a criminal case, present or future, but of compelling him to yield possession of property that he no longer is entitled to keep. If a trustee had been appointed, the title to the books would have vested in him by the express terms of § 70, and the bankrupt could not have withheld possession of what he no longer owned, on the ground that otherwise he might be punished. That is one of the misfortunes of bankruptcy if it follows crime. The right not to be compelled to be a witness

against oneself is not a right to appropriate property that may tell one's story.

Justice Holmes' ruling in *Harris* is, of course, equally applicable under the Bankruptcy Act. As noted above, the Finax Documents constitute property of the debtor's estate under 11 U.S.C. § 541, which must be turned over to the Chapter 7 trustee under 11 U.S.C. §§ 521(4) and 542(e).

5. It should be noted that most of these cases were decided prior to *Bouknight* and *Doe,* discussed below. Because *Doe* and *Bouknight,* when read in conjunction with *Fisher,* make clear that no Fifth Amendment privilege exists as to the contents of *any* subpoenaed material, these cases have since become inapposite to the extent they seek to examine the contents of the documents.

thing which the taxpayer is compelled to do—would not itself involve testimonial self-incrimination." *Id.* at 410–411, 96 S.Ct. 1569. As a matter of logic, the content of the documents to be produced is not relevant to the Constitutional inquiry because the mere act of producing a document, whether in a sealed carton or open delivery, in fact does not communicate either the content of the document or why it might be incriminating.

In *Doe* and *Bouknight* the Supreme Court further articulated the doctrine established in *Fisher* that any analysis of the act of production privilege must proceed wholly without reference to the contents of the subpoenaed material. In *Doe,* the Court considered whether subpoenaed business records of an individual proprietorship [6] could be subject to a claim of Fifth Amendment privilege, finding, "[w]here the preparation of business records is voluntary, no compulsion is present.... [a] subpoena that demands production of documents 'does not compel oral testimony; nor would it ordinarily compel the taxpayer to restate, repeat or affirm the truth of the *contents* of the documents sought.'" *Doe,* 465 U.S. at 610–611, 104 S.Ct. 1237, citing *Fisher,* 425 U.S. at 409, 96 S.Ct. 1569, emphasis supplied. More significantly, in her concurrence in *Doe,* Justice O'Connor wrote separately "to make explicit what is implicit in the analysis of [the majority opinion]: that the Fifth Amendment provides absolutely no protection for the contents of private papers of any kind." *Doe,* 465 U.S. at 618, 104 S.Ct. 1237.

■ Then in *Bouknight,* the Court expressly adopted Justice O'Connor's concurrence in *Doe,* stating "a person may not claim the Amendment's protections based upon the incrimination that may result from the contents or the nature of the thing demanded." *Bouknight,* 493 U.S. at 555, 110 S.Ct. 900. Although *Bouknight* treats the issue of whether a parent who has custodial control of her child may resist a court order to produce the child on the basis of the parent's Fifth Amendment privilege, the basis of the

Court's decision rests firmly upon *Fisher* and its progeny.

The line of decisions beginning with *Fisher* and extending through *Doe* and *Bouknight* firmly establish the principle that the contents of subpoenaed material are irrelevant to a claim of Fifth Amendment privilege. This principle is founded on two interrelated bases; the first, as discussed above, that any mute testimony elicited by an act of production generally would not be testimonial as to the contents of the document (*cf.,* footnote 8, below); and the second, that the contents would in any event be irrelevant to any claim of privilege because substantively no such privilege exists under the Fifth Amendment as to the contents of subpoenaed material. *See In re Grand Jury Subpoena Duces Tecum Oct. 29, 1992,* 1 F.3d 87 (2d Cir.1993), discussed below.

Having summarized the principles of analysis established by the Supreme Court in *Fisher,* these precepts must now be applied to the particular facts in this case, for the issues "do not lend themselves to categorical answers; their resolution may instead depend on the facts and circumstances of particular cases or classes thereof." *Fisher,* 425 U.S. at 410, 96 S.Ct. 1569. As shown below, the Fifth Amendment cannot be invoked to suppress the Finax Documents for three separate and independent reasons: (1) the facts revealed by the act of production are a "foregone conclusion;" (2) the act of production, although testimonial, is not incriminating; and (3) no Fifth Amendment privilege exists as to the contents of the Finax Documents.

**(1) *The "foregone conclusion" principle bars the privilege***

■ Production of the Finax Documents by Neil Roth would undoubtedly equate to a tacit, testimonial acknowledgment that the Finax Documents exist, that they are within the possession, custody or control of the debtor through his attorneys and forensic accountant and that the documents to be produced are those called for by the subpoena. But these acknowledgments add nothing

---

**6.** It is of course well settled that the privilege may not be invoked by corporations under the "collective entity" doctrine. *See Braswell v. U.S.,*

487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988).

to what is already open and notorious information by reason of the debtor's testimony under oath in his examination on February 20, 1997. (*See* Transcript at pages 4–5, 15, 21, 24, 32, 46, 47, 56.) Thus, the existence, location and identification of the Finax. Documents are a "foregone conclusion," in the language of the Supreme Court in *Fisher*. The testimonial act of producing the documents, whether by Neil Roth or the debtor himself, adds nothing to the information now available to enable any potential Government prosecutor to seize the Documents, either by subpoena or warrant.

But, the debtor asserts, "[w]hile the Debtor has acknowledged that unspecified records exist and that they are in the possession of Mr. Roth, he never stated what the specific records are, what types of records exist, or what information can be gleaned from the records." Accordingly, the debtor argues that "[t]he existence and production of specific papers are not a foregone conclusion [and] [b]ecause the Trustee does not have independent knowledge of the existence of, the possession of, and the authenticity of the specific documents which are the subject of this motion, the act of producing them could incriminate the Debtor." Reply Application 3–4. The error in the debtor's argument lies in its confusion of that which is communicated by the debtor through his act of production, on the one hand, and that which is communicated by the Documents themselves, on the other. As made clear by the Supreme Court in *Fisher* and its progeny (putting aside the question of "authenticity" for the moment), the act of production is communicative (*i.e.,* testimonial) only as to the "existence of the papers demanded and their possession or control by the [producer]." 425 U.S. at 410, 96 S.Ct. 1569. All specific information with respect to the papers demanded—*i.e.,* their content and nature, whether ledgers, lists, letters, bank records or whatever—is communicated *by the documents themselves,* not by the act of production. This distinction becomes self-evident when one considers that the act of production typically would be accomplished by delivering a box, or conducting the examiner to a conference room where the documents are located, an act which by itself communicates nothing as to the specifics of the documents. The specifics of the documents—what they are and what they contain—can be ascertained only by examining the documents themselves, and the examination is not an act of the debtor or Neil Roth nor is it a part of the act of production.

The debtor argues further that the act of production "authenticates" the Finax Documents, asserting that "the Debtor's communication that they are his is potent evidence that he made and kept them, and that they are genuine." Supplemental Brief (under seal) 4. The argument misstates the law and misapplies it in the context of this particular case. The Supreme Court in *Fisher* did not state that the act of production "authenticates" the documents produced, because, depending upon the description contained in the subpoena, an act of production would not necessarily provide any authentication. The Court said that the act of production "would indicate the taxpayer's belief that the papers are those described in the subpoena." *Fisher,* 425 U.S. at 410, 96 S.Ct. 1569. It is, of course, possible that an act of production might authenticate particular documents by reason of the wording of the subpoena. Thus, a subpoena requiring Mr. X to produce "all letters signed and sent by Mr. X relating to a particular transaction" would indeed "authenticate" the documents produced as letters signed and sent by Mr. X relating to the particular transaction, since that is what the subpoena called for. But the resolution of Fifth Amendment issues "depend[s] on the facts and circumstances of particular cases," *id.,* and so one must examine the extent of "authentication" which might result from the Roth subpoena. The subpoena commanded Neil Roth to produce "all books and records currently in your possession in regard to . . . Finax." The act of producing the Finax Documents now in the custody and control of Neil Roth does no more than communicate the debtor's belief [7] that the Documents in question constitute "books and records in

---

7. Actually, here it would communicate Neil Roth's belief, not the debtor's, although Roth's

belief is confirmed by the debtor's testimony.

regard to Finax"—it communicates nothing with respect to who prepared the Documents, under what circumstances, why, whether they were sent or received, whether they are genuine, accurate or complete, whether, how or by whom they were used, or anything else. And, as already demonstrated, the information which the act of production does communicate—that the Documents constitute "books and records in regard to Finax"—has already been placed in the public record by the repeated testimony of the debtor and statements of his counsel at the debtor's February 20, 1997 deposition. Thus, "[t]he testimonial impact of producing the documents would therefore be negligible, and would serve only to confirm what is already known." *S.E.C. v. First Jersey Securities, Inc.,* 843 F.2d 74, 76 (2d Cir.1988) (prior statements as to location and existence of documents, coupled with parallel production of similar documents by other officers of corporation, rendered any testimonial act of branch manager as to existence or authenticity of subpoenaed material a "foregone conclusion").

Finally, the debtor's counsel has argued at length *ex parte* orally and in writing under seal that production of the Finax Documents would constitute a "potential link in a chain of evidence" which might incriminate the debtor by reason of the potentially incriminating contents of the Documents. Once again, however, the argument wholly misconceives the act of production doctrine as articulated by the Supreme Court. The fact (if it is a fact) that the Documents may incriminate the debtor does not make them privileged. As shown above, the Court in *Fisher* repeatedly stated that the incriminating content of the documents does *not* implicate the Fifth Amendment privilege. The inquiry is not what the documents communicate, but what

the act of production communicates. It must be the "testimonial communication that is incriminating," *Fisher,* 425 U.S. at 408, 96 S.Ct. 1569, not the documents that are produced.

▮▮▮ In the circumstances of this case, the act of production communicates no more than what the debtor and his counsel have repeatedly communicated at the February 20, 1997 deposition. Since the "existence," the "possession or control," and the fact that "the papers are those described in the subpoena," *id.* at 410, 96 S.Ct. 1569, were all established by the debtor's voluntary testimony on February 20, 1997, these facts "are a foregone conclusion" and the act of production "adds little or nothing to the sum total of the Government's information...." *Id.* at 411, 96 S.Ct. 1569. "Under these circumstances by enforcement of the summons 'no constitutional rights are touched. The question is not of testimony but of surrender.' *In re Harris,* 221 U.S. 274, 279, 31 S.Ct. 557, 55 L.Ed. 732 (1911)." *Fisher,* 425 U.S. at 411, 96 S.Ct. 1569. The fact that the debtor may be incriminated by the contents of the Finax Documents "is one of the misfortunes of bankruptcy if it follows crime." *In re Harris,* 221 U.S. at 279, 31 S.Ct. 557. The Fifth Amendment is not a license by which a party may suppress incriminating evidence; it is a limited privilege against compelled self-incriminating *testimony.*

**(2) *The act of production is not incriminating***

▮▮▮ As shown above, the issue as articulated by the Supreme Court in *Fisher* is whether the act of production is "*both* 'testimonial' *and* 'incriminating'...." 425 U.S. at 410, 96 S.Ct. 1569, emphasis supplied.[8] The

---

**8.** This is a "difficult issue," as acknowledged by the Supreme Court, and properly so where a party seeks to invoke the shield of privilege to suppress evidence which is vital to the rights of others. But circumstances may exist where an act of production is both testimonial and incriminating, without regard to the content of the document or thing required to be produced. For example: compliance with a subpoena calling for production of property which was stolen might constitute tacit acknowledgment of incriminating possession of illicit property; com-

pliance with a subpoena calling for production of "counterfeit currency or bonds" could be a mute admission as to not only the existence and possession of the items but also incriminating knowledge of their counterfeit nature; compliance with a subpoena calling for production of "the gun used to shoot John Doe" or "documents used by the producer to [engage in some nefarious activity]" might admit possession of items used to commit crimes. Alternatively, one may envision a situation where illicit possession of perfectly innocuous property might occur,

"incriminating" leg of the test (as well as the "testimonial") must be satisfied by the act of production "wholly aside from the contents of the papers...." *Id.*

In this case compliance by either Neil Roth or the debtor with a subpoena calling for production of "all books and records in regard to Finax" is testimonial, but it is not incriminating. It is testimonial because it acknowledges the existence and the debtor's possession of the Finax Documents, and the fact that the Documents produced are those described in the subpoena. But there is nothing incriminating in the fact that the Documents exist, or their possession by the debtor, or the fact that the Documents produced are those described in the subpoena. It is not unlawful for documents to exist regarding business activity, or for the person engaging in that activity to possess the documents. Nor is it incriminating that the debtor acknowledges that the Documents produced are those described in the subpoena, *i.e.*, "books and records in regard to Finax." The only potentially incriminating information which the debtor has identified is the information contained in the Documents. But the contents of the documents and why they may be incriminating are not communicated by the debtor's mere act of production. Because the debtor's act of producing the Finax Documents is not a "testimonial communication that is incriminating"—*i.e.*, an act which is "both 'testimonial' and 'incriminating' " "wholly aside from the contents of the papers produced"—the Fifth Amendment

such as the possession of stolen bearer bonds. Indeed, the situation would be somewhat analogous to that in *In re Grand Jury Subpoenas Duces Tecum*, 722 F.2d 981 (2d Cir.1983) ("Saxon"), where the issue confronting the court was an act of production which would have tacitly testified to the wrongful possession, *i.e.* theft, of corporate documents by a former principal, quite apart from the contents of the documents themselves.

Where the subpoena calls for production of documents, the determination of whether compliance would be incriminating is informed by the language of the subpoena, not the content of the documents demanded. For example, compliance with a subpoena requiring production of "all letters written by Producer in connection with X Transaction," where X Transaction involves criminality, would acknowledge that the debtor wrote the letters produced and that the

cannot be invoked to defeat the trustee's right to production of the Documents for the use and benefit of the debtor's estate and its creditors. To quote the Supreme Court in *Fisher*, equally applicable here, "however incriminating the contents of the [Finax Documents] might be, the act of producing them—the only thing which the [debtor] is compelled to do—would not itself involve testimonial self-incrimination." *Id.* at 410–11, 96 S.Ct. 1569. "The [debtor] cannot avoid compliance with the subpoena merely by asserting that the item of evidence which he is required to produce contains incriminating writing...." *Id.* at 410, 96 S.Ct. 1569.

### (3) *No Fifth Amendment privilege exists as to the contents of the subpoenaed documents*

The Debtor's argument that production of the Finax Documents would "provide a link in the chain" by reason of any incriminating contents of the Documents, closely akin to its "authentication" argument, implicitly assumes that the putatively incriminatory contents of subpoenaed Documents somehow enjoy Fifth Amendment protection. However, as has been made by clear by the Supreme Court's decisions in *Fisher, Doe* and *Bouknight*, the contents of subpoenaed records, no matter how incriminating, are not protected from disclosure under any assertion of the privilege by the Debtor.

As the Second Circuit has stated:

letters related to the illicit X Transaction, wholly without reference to the content of the letters themselves. By contrast, compliance with a broad subpoena under 11 U.S.C. § 521(4) calling for surrender of all "books, documents, records, and papers, relating to property of the estate ..." would not be incriminating, even if it required production of the very same letters, because the act of production would not be testimonial as to any information other than existence, possession and the fact that the letters produced were "papers, relating to property of the estate...." The Producer could be incriminated only by examining the letters after their production, authenticating them by competent testimony or other evidence and establishing the relationship of the letters to the illicit X Transaction either by the content of the letters or other evidence, none of which is communicated by the mere act of production.

Self-incrimination analysis now focuses on whether the creation of the thing demanded was compelled and, if not, whether the act of producing it would constitute compelled testimonial communication. [citations omitted] Further, the *Bouknight* Court's citation of Justice O'Connor's *Doe* concurrence indicates that this analysis applies regardless of "the contents or nature of the thing demanded" [citing *Doe* ] ... Third, the three courts of appeals that have considered this question have all concluded that the Fifth Amendment does not protect the contents of voluntarily prepared documents, business or personal. [citations omitted]

*In re Grand Jury Subpoena Duces Tecum Oct. 29, 1992,* 1 F.3d at 93. The Debtor makes no claim that the Finax Documents were other than voluntarily prepared.

The privilege may not be asserted on the basis of the contents of corporate books and records since a corporation or similar organization may not assert the privilege under the collective entity doctrine. *See Braswell,* 487 U.S. at 104, 108 S.Ct. 2284 (footnote 6, above). The *Doe* court extended this proscription to the contents of business records voluntarily prepared by a sole proprietor, *Doe,* 465 U.S. at 611–612, 104 S.Ct. 1237. Finally, the *Bouknight* court made clear that the privilege cannot be invoked based on any incrimination arising from the contents or nature of subpoenaed material. *Bouknight,* 493 U.S. at 555, 110 S.Ct. 900. In short, no Fifth Amendment privilege may be claimed with respect to the contents of subpoenaed material, no matter how incriminating.[9]

The motion to quash the Roth subpoena is denied. Counsel for directed to settle an order.

---

9. Because the act of production in this case would not be incriminating and would be testimonial as to facts which are a "foregone conclusion," it is unnecessary to reach the question, raised by the *Bouknight* decision, whether the debtor's disclosure obligations under the Bankruptcy Code would override his Fifth Amendment privilege even if the act of production were incriminating. In *Bouknight* the Supreme Court concluded that, even if compliance with the production order constituted a testimonial communication that was incriminating, "Bouknight may not invoke the privilege to resist the production order because she has assumed custodial duties related to production and because production is required as part of a noncriminal regulatory regime." 493 U.S. at 555–56, 110 S.Ct. 900. The Court went on to discuss several of its earlier decisions which had held that, despite the potential for self-incrimination, "the Fifth Amendment privilege may not be invoked to resist compli-

ance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws." *Id.* at 556, 110 S.Ct. 900, citing *Shapiro v. United States,* 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948) (concerning the Emergency Price Control Act of 1942 which required licensed businesses to maintain records and make them available for inspection by administrators); *California v. Byers,* 402 U.S. 424, 91 S.Ct. 1535, 29 L.Ed.2d 9 (1971) (upholding enforcement of a statute requiring drivers involved in car accidents to stop and provide information, while acknowledging that in particular cases the statute would compel incriminating testimony); and *United States v. Sullivan,* 274 U.S. 259, 47 S.Ct. 607, 71 L.Ed. 1037 (1927) (rejecting Fifth Amendment objection to the requirement to file income tax returns, which obviously may entail compelled self-incrimination).