IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-338

Filed 6 May 2026

Mecklenburg County, No. 22CR366223-590

STATE OF NORTH CAROLINA

v.

CHRISTOPHER JAMES PALMITER

Appeal by defendant from judgment entered 31 May 2024 by Judge Matt J. Osman in Mecklenburg County Superior Court. Heard in the Court of Appeals 19 March 2026.

*Attorney General Jeff Jackson, by Special Deputy Attorney General Michael T. Henry, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Sterling Rozear, for defendant-appellant.*

ARROWOOD, Judge.

Christopher James Palmiter ("defendant") appeals from judgment entered 31 May 2024 upon his conviction of failure to report the disappearance of a child. For the following reasons, we affirm defendant's conviction.

I.     Background

Defendant met Diana on an online dating site in 2008 while she was living in

Moldova. In 2015, Diana and her four-year-old daughter Mary[1] moved to the United States on a K-1 visa and began living with defendant in Cornelius, North Carolina. Defendant and Diana married shortly thereafter. Though defendant is not Mary's biological father, he sponsored Mary's immigration, referred to Mary as his daughter, and was listed as her father in her school enrollment forms. Defendant also provided Mary's health insurance as well as her food and other necessities. Defendant worked nine-hour shifts as a design draftsman at a company an hour-and-a-half drive away from their home. He also ran a side business doing laser engraving and woodworking out of his garage. Diana did not work outside of the home and was the primary caretaker of Mary. She enrolled Mary in school and made most decisions about the household and Mary's care.

After moving in with defendant, Diana grew increasingly spiritual. In 2017, she became a follower of Elizabeth Clare Prophet. Diana began chanting and would scream prayers at the top of her lungs. She involved defendant and Mary in rituals she referred to as "fighting demons" where she would use knives above their heads and around their bodies to "cut the imaginary strings that demons had around" them. Diana also ritually burned things in the family's fire pit. The items she burned became increasingly unusual and in 2022 she was burning metal coatracks and stainless steel mugs.

---

[1] A pseudonym is used to protect the identity of the minor child.

Diana also became paranoid over time. She would instruct defendant to pose a certain way during discussions and if he scratched his nose, she would accuse him of sending messages to the host of a podcast he watched. Diana became suspicious of Mary's school after they sent home proofs of Mary's school photos that included a message about stopping child trafficking. When Diana saw the message, she indicated that Mary was being watched and "they" wanted to traffic her. Diana also believed that "Russian entities," including Michael Jackson and Vladimir Putin, were tracking her and Mary because Diana had titles of importance. Diana told defendant that she wanted to hide Mary from these entities.

Mary disappeared around November 2022 and remains a missing person. She was last seen at school on 21 November 2022, just before the Thanksgiving holiday. On 22 November 2022, Diana told defendant to go visit his brother in Michigan for Thanksgiving. Defendant stayed in Michigan until the following Saturday, 26 November. After he returned from his trip, he did not see Mary.

Mary's absence from school caught the attention of her school counselor, Danice Lampkin. Ms. Lampkin left voicemails with defendant on 30 November and 1, 6, 7, and 13 December 2022. She also emailed defendant on 6 and 7 December 2022. She made similar attempts to contact Diana but received no response from her or defendant. Ms. Lampkin eventually made contact with a woman named Sandy, a longtime friend of defendant who had been identified as an emergency contact for Mary. Sandy informed defendant via text that Ms. Lampkin

was trying to reach him and he responded "okay." After the call to Sandy, there was contact to the main office reporting that Mary was sick.

On 13 December 2022, Ms. Lampkin contacted Sandy again and informed her that she would be conducting a home visit with the school police officer to see Mary. Sandy's husband relayed that message to defendant who texted Diana that she needed to tell the school that she was taking Mary out of school and would homeschool her. When Ms. Lampkin conducted the home visit, she repeatedly knocked on the door but received no response. She left a truancy packet at the door that included letters and emails sent by the school, Mary's attendance summary, and her history of absences.

On 14 December 2022, Diana called Ms. Lampkin in response to the truancy packet and agreed to meet at the school the following morning. Ms. Lampkin insisted that Diana bring Mary with her to the school but Diana arrived alone. Defendant later arrived separately. Diana informed Ms. Lampkin that Mary was missing and had not been seen for several weeks. Ms. Lampkin immediately contacted the Department of Social Services and reported the disappearance. The school resource officer contacted the local police, and Detective Corporal Bradley Nichols arrived at the school shortly thereafter.

Detective Nichols interviewed defendant and defendant told him he had last seen Mary prior to his Thanksgiving trip and had started to realize Mary was not at the house around a week after he got back. He also acknowledged having received

Ms. Lampkins' messages but thought that Diana was handling it. When asked about whether he had spoken with Diana about Mary's whereabouts, defendant explained that on one occasion, Diana had told him Mary was in the bathroom and he confirmed that not to be true. Additionally, at some point Diana told defendant that she did not know where Mary was and in turn asked if he knew where Mary was. Defendant and Diana had similar conversations on multiple occasions.

On 17 December 2022, defendant and Diana were arrested for the felonious failure to report the disappearance of a child under N.C.G.S. § 14-318.5(b). Under § 14-318.5(a), the disappearance of a child is defined as "[w]hen the parent or other person providing supervision of a child does not know the location of the child and has not had contact with the child for a 24-hour period." Section (b) of the statute states that it is a felony for "[a] parent or any other person providing care to or supervision of a child" to "knowingly or wantonly fail[ ] to report the disappearance of a child to law enforcement." Defendant was indicted under § 14-318.5, pled not guilty, and went to trial on 20 May 2024. Diana pled guilty before defendant's trial.

At his trial, defendant testified that though he did not see Mary in the weeks between his return from Michigan and the 13 December meeting, he had no reason to think Mary was missing because Diana conveyed to him that Mary was at home. He explained that on 28 November, he returned to work. That week, Diana spoke of Mary as if she were in the house and texted defendant as if she were with Mary. For example, she texted defendant on 1 December 2022 saying "we're in town already."

When defendant asked Diana about Ms. Lampkin's messages that Mary had been absent from school, Diana told him that she was sick in her room. Diana later left a note for defendant saying, "we're hiking in the mountains." On 6 December 2022, Diana left another note saying, "gone for two days." Defendant stated that it was not uncommon for Diana to take Mary hiking alone, but that the notes made him concerned that Diana may have left him and that she and Mary were not coming back. In his testimony, defendant acknowledged the statements he made to Detective Nichols about having asked Diana where Mary was and her saying she did not know. He also acknowledged that Diana asked him on multiple occasions where Mary was but said that Diana was just "mirroring" his comments.

In addition to defendant's testimony, the jury heard testimony from Ms. Lampkin, Detective Nichols, and the digital forensic examiner who analyzed defendant's phone, among others. The jury was then instructed on a narrowed scope of the substantive crime. The trial court concluded that though the statute provided for liability for both parents and other persons providing care or supervision, a stepparent was not necessarily a "parent" within the law. Thus, in its instructions, the trial court removed any reference to a parent to ensure an unambiguous basis for the jury's verdict. The jury found defendant guilty on 31 May 2024. The trial court imposed a presumptive range of 6 to 17 months' imprisonment, suspended as required by law given defendant's lack of any prior convictions in favor of 30 months' supervised probation. Defendant entered notice of appeal to this Court on

31 May 2024.

## II.    Discussion

Defendant presents four issues on appeal: 1) whether N.C.G.S. § 14-318.5 is unconstitutionally vague; 2) whether N.C.G.S. § 14-318.5 unconstitutionally compels self-incrimination; 3) whether the trial court erred by denying defendant's motion to dismiss because there was insufficient evidence defendant knowingly failed to disclose the disappearance of a child; and 4) whether the trial court erred by refusing to admit evidence of Diana's text message indicating Mary was with her when it was relevant and not hearsay. We address each issue in turn.

### A.    Constitutional Challenges to N.C.G.S. § 14-318.5

Defendant argues that the trial court erred by denying his motion to dismiss because N.C.G.S. § 14-318.5 is unconstitutionally vague and compels self-incrimination. Specifically, defendant contends that § 14-318.5 cannot be interpreted literally because doing so would produce absurd results and violate the constitutional rights of parents, and the statute lacks guidance on how to interpret the statute beyond a literal interpretation. Additionally, defendant claims that § 14-318.5 compels disclosure of self-incriminating statements that could be used, or lead to other evidence that could be used, in a criminal prosecution. For the following reasons, we hold that the trial court did not err by denying defendant's motion to dismiss.

#### 1.    Standard of Review

"Whether a statute is constitutional is a question of law that this Court reviews de novo." *State v. Grady*, 372 N.C. 509, 521 (2019) (citation omitted). Under de novo review, this Court " 'considers the matter anew and freely substitutes its own judgment' for that of the lower tribunal." *State v. Wright*, 388 N.C. 225, 229 (2025) (quoting *State v. Biber*, 365 N.C. 162, 168 (2011)). However, "we presume that laws enacted by the General Assembly are constitutional, and we will not declare a law invalid unless we determine that it is unconstitutional beyond [a] reasonable doubt." *Grady*, 372 N.C. at 521 (quoting *Cooper v. Berger*, 370 N.C. 392, 413 (2018)) (alteration in original).

## 2. Preservation

As a preliminary matter, we address the preservation of defendant's vagueness argument. On 13 May 2024, defendant filed a pretrial motion to dismiss requesting, in part, that the trial court dismiss the prosecution because § 14-318.5 is vague. Defendant argued that the terms "parent," "other person," and "supervision" were not sufficiently defined such that it was unclear who fell under the statute and how often or how long the supervision had to occur in order to incur liability. Defendant explained that the language of the statute "would arguably even allow a babysitter or a neighbor who only supervised the child for a matter of hours the day or night before their last contact to be charged."

On appeal, defendant argues that a literal interpretation of the statute, including the terms identified at the trial level and the definition of "disappearance

of a child," would be absurd because it could apply to a wide range of people providing supervision and parents often do not know the precise location of their child while going longer than 24-hours without contacting them. Defendant provides several examples of absurd applications of the statute: parents who send their children to a sleepaway camp or boarding school and go more than 24 hours without contacting the child; parents who travel or are in the military and are stationed overseas with no direct knowledge of their child's location; teachers who do not know the location of their students over the weekend, etc.

Defendant explains that because it would be absurd, the statute cannot be construed literally and there is a lack of guidance on how else to interpret the statute, thereby inviting arbitrary enforcement and failing to provide fair notice of the conduct that the statute punishes. Defendant also argues that the statute cannot be interpreted literally because that would implicate a parent's constitutional right to the care, custody, and nurture of their children. The State contends that defendant is presenting a new vagueness argument on appeal that is not preserved for review. We disagree.

"[T]o preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1). "Applying Rule 10, we have held that an issue was unpreserved when the substance of a party's objection at trial

was either irreconcilable with or unrelated to the substance of the defendant's argument on appeal." *State v. McLymore*, 380 N.C. 185, 193 (2022); *see also State v. Whittington*, 367 N.C. 186, 192–93 (2014) (holding that an issue was not preserved where defendant argued at trial that a statute was invalidated and on appeal argued that the State failed to comply with the statute). Similarly, where "a defendant argues one constitutional theory at trial and a different constitutional theory on appeal, the defendant may be deemed to have failed to preserve their appellate arguments[.]" *State v. Johnson*, 279 N.C. App. 475, 479 (2021) (citations omitted).

"However, Rule 10 does not bind a party on appeal only to arguments identical to the ones offered in support of an objection at trial." *McLymore*, 380 N.C. at 193. Rather, Rule 10's specificity requirement is satisfied "[i]f a party's objection puts the trial court and opposing party on notice as to what action is being challenged and why the challenged action is thought to be erroneous—or if the what and the why are 'apparent from the context[.]'" *Id.* (quoting N.C. R. App. P. 10(a)(1)). For example, this Court has deemed an issue preserved where the defendant's argument on appeal rested on a slightly different factual basis but relied on the same underlying constitutional basis. *Johnson*, 279 N.C. App. at 481.

Here, though defendant expanded his vagueness argument on appeal, the underlying constitutional basis is the same and his arguments are sufficiently similar to put both the trial court and the State on notice of what was being challenged and why. "Absurdity" is not a separate ground for a constitutional objection but rather a

concept used in statutory interpretation. Defendant is merely alleging the absurdity of a literal interpretation of § 14-318.5 to illustrate why the statute is so difficult to interpret such that it rises to the level of unconstitutional vagueness. Thus, the substance of defendant's argument is the same.

Moreover, though not explicitly stated, defendant's absurdity argument was apparent from the context of his pretrial motion. Defendant's core argument was that the boundaries of § 14-318.5 are vague. To illustrate his point, defendant provided examples of how the statute could be construed, including allowing for a babysitter who briefly provided care to be prosecuted. That example is similar to the ones defendant uses in his argument before this Court and implies that part of why the statute is vague is that, pushed to the margins and interpreted literally, the statute produces absurd results. Accordingly, defendant's pretrial motion put both the trial court and the State on notice that he was arguing that the statute was void-for-vagueness because the literal interpretation of the statute is absurd. Therefore, defendant's vagueness argument is preserved for appellate review.

### 3.   Vagueness

Having determined that the issue is preserved, we turn to the merits of defendant's argument that § 14-318.5 is unconstitutionally vague. Defendant's argument is as summarized above. In response, the State argues that defendant misreads the statute and that a proper reading of the plain language does not produce absurd results. First, the State contends that the term "person providing care to or

supervision of a child" is a common statutory description that includes temporary caregivers, such as teachers or babysitters, only to the extent justified by context. Second, the State argues that general locations such as camps or boarding school could satisfy the known location requirement and that having contact with the child should be defined broadly to include any sharing of information with the child. Finally, the State also argues that regardless of the hypothetical difficulties defendant provides, § 14-318.5 is clear as applied to defendant.

The State violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015); *see also State v. Mello*, 200 N.C. App. 561, 567 (2009). Thus, " 'the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.' " *Beckles v. United States*, 580 U.S. 256, 262 (2017) (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). "When evaluating whether a person of ordinary intelligence could determine what conduct is prohibited, ' "[o]nly a reasonable degree of certainty is necessary, mathematical precision is not required." ' " *Mello*, 200 N.C. App. at 567 (quoting *State v. Sinnott*, 163 N.C. App. 268, 274 (2004)).

As summarized by the Fourth Circuit, the vagueness doctrine "distinguishes

between statutes that 'require[ ] a person to conform his conduct to an imprecise but comprehensible normative standard' and those that specify 'no standard of conduct.' " *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016) (quoting *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)). Statutes that fall into the latter category are unconstitutionally vague, even where there are some clearly constitutional applications. *Id.* For example, in *Coates*, the United States Supreme Court held that a law prohibiting people from assembling on a sidewalk and conducting themselves "in a manner annoying to persons passing by" was void for vagueness because the term "annoying" is subjective and imposes an unascertainable standard. *Coates*, 402 U.S. at 611, 614. That standard is still vague "even though spitting in someone's face would surely be annoying." *Johnson*, 576 U.S. at 603 (citing *Coates*, 402 U.S. 611).

Conversely, statutes in the former category have "a constitutional 'core' in the sense that they 'apply without question to certain activities,' even though their application in marginal situations may be a close question." *Doe*, 842 F.3d at 843. (quoting *Parker v. Levy*, 417 U.S. 733, 755–56 (1974)). Those statutes may not be void for vagueness where the challenger's conduct falls within that "constitutional core." *See id.* Thus, even for facial challenges, "[w]e consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.' " *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–19 (2010) (quoting *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S.

489, 496 (1982)).  *See also Parker*, 417 U.S. at 755–56; *Smith v. Goguen*, 415 U.S. 566, 577–78 (1974).

In *Holder*, the plaintiffs argued that a law "prohibit[ing] the provision of 'material support or resources' to certain foreign organizations that engage in terrorist activity" was unconstitutionally vague.  561 U.S. at 7 (quoting 18 U.S.C. § 2339B(a)(1)).  The plaintiffs sought to provide support for the humanitarian and political activities of groups that had been designated as foreign terrorist organizations in the form of "monetary contributions, other tangible aid, legal training, and political advocacy[.]"  *Id.* at 10.  They argued the law was vague because the definitions of terms such as "training" or "expert advice or assistance" were difficult to apply in certain hypotheticals and would encompass a broad range of activity protected by the First Amendment.  *Id.* at 14, 21–22.  The United States Supreme Court rejected that argument, stating that "[w]hatever force these arguments might have in the abstract, they are beside the point" because the plaintiff's actual proposed conduct was clearly proscribed by the statute.  *Id.* at 22. Additionally, the Court held that while the application of the statute to hypothetical cases could make for a successful overbreadth claim under the First Amendment, vagueness challenges do not "turn on whether a law applies to a substantial amount of protected expression."  *Id.* at 20.

Before applying these rules to the case at hand, we note that defendant does not apply the framework used in *Holder* to argue whether his conduct was clearly

proscribed by § 14-318.5.  Instead, when describing the standard for facial challenges to a statute under the void-for-vagueness doctrine, defendant emphasizes the rule in *Johnson* that the Supreme Court of the United States' "holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that falls within the provision's grasp." *Johnson*, 576 U.S. at 602.  Some courts have interpreted this language, as well as the fact that the Court declined in *Johnson* to consider whether the law was vague as applied to the defendant's conduct, as casting doubt on *Holder* and the rule that vagueness challenges fail where the challenger's conduct was clearly proscribed by the law.  *See, e.g.*, *U.S. Telecom Ass'n v. Fed. Commc'ns Comm'n*, 825 F.3d 674, 735–36 (D.C. Cir. 2016); *State v. Doyal*, 589 S.W.3d 136, 144 (Tex. Crim. App. 2019).

However, the Court in *Johnson* was describing how even the laws that were deemed vague for providing no standard of conduct had some conduct that fell within the provisions grasp, e.g., spitting in someone's face being clearly annoying. *Johnson*, 576 U.S. at 602–603.  Additionally, while the Court in *Johnson* did decline to consider whether the law at issue was vague as to the defendant's specific conduct, it explained that the application of the statute at issue, the residual clause of 18 U.S.C. § 924(e)(2)(B), was not intended to be applied to the defendant's actual conduct. *Id.* at 604.  18 U.S.C. § 924(e)(2)(B) enhanced sentencing for defendants who had been previously convicted of three violent felonies or serious drug offenses. *Id.* at 593.  Under the statute, whether a defendant's conviction was for a "violent felony"

depended on if the conviction was for a crime that in "the ordinary case" presents a serious potential risk of physical injury. *Id.* at 596. In other words, it employed a categorical approach to determining whether a crime is a "violent felony" as opposed to looking at the defendant's conduct. *Id.* As such, the nature of defendant's actual conduct would provide no additional notice as to whether the statute would apply to them and the Court accordingly declined to conduct an as-applied analysis. *See id.* at 604.

The *Johnson* Court did not expressly overrule *Holder* or its other past holdings that a defendant whose conduct is clearly proscribed by the statute cannot succeed on a facial void-for-vagueness challenge. Nor is *Johnson* inconsistent with that rule since the Court declined to conduct an as-applied challenge only where doing so would jettison the categorical approach used under the statute at issue. Accordingly, we conclude that *Holder* and its line of preceding cases considering vagueness challenges as-applied to the challenger are still binding where the statute at issue considers the defendant's actual conduct. Notably, our determination is consistent with several federal circuit courts. *See United States v. Hasson*, 26 F.4th 610, 617–21 (4th Cir. 2022) ("[W]e conclude that *Johnson* and *Dimaya* 'did not alter the general rule that a defendant whose conduct is clearly prohibited by a statute cannot be the one to make a facial vagueness challenge.' "); *United States v. Requena*, 980 F.3d 30, 40–43 (2d Cir. 2020); *United States v. Cook*, 970 F.3d 866, 877 (7th Cir. 2020); *United States v. Bramer*, 832 F.3d 908, 909 (8th Cir. 2016); *Kashem v. Barr*, 941 F.3d 358, 375–76 (9th

Cir. 2019).

Here, § 14-318.5 does not rely on untethered subjective judgments that provide "no standard of conduct." Rather, it has defined terms which apply without question to a core range of conduct but may become difficult to apply in certain cases. Defendant's argument illustrates how the vagueness of the statute is confined to cases on the margins. Defendant does not argue that the plain language of § 14-318.5 is itself indeterminate like the term "annoying." Instead, defendant contends that when applied to specific cases, the plain meaning would lead to absurd results which the Court must avoid by narrowing the scope of the statute. It is how the statute should be narrowed that defendant says is unpredictable, making the statute vague. Thus, defendant's argument relies on hypotheticals that would fall on the margins such as where the defendant affirmatively knows the general location of the child, e.g. at boarding school, but not their precise location.

As in *Holder*, just because the scope of the statute is not clear in every application does not mean that the statute is wholly void for vagueness. Nor does the fact that an expansive application of the statute may implicate a parent's constitutional right to custody, care, and nurture of their children. Rather, the dispositive point is that defendant's conduct is clearly proscribed by § 14-318.5 and application of the statute to defendant is not absurd. Defendant does not contest that he falls under the definition of an "other person providing care to or supervision of a child." He was listed as Mary's father on her school forms, lived with her, and

provided for her insurance, food, and other necessities. Additionally, defendant does not fall into an unclear category where he had general knowledge of Mary's whereabouts but not her precise location. Instead, the State alleged, and presented evidence tending to show, that defendant did not know Mary's location at all and was aware that Mary's location was unknown. Therefore, regardless of whether a literal interpretation of § 14-318.5 would be absurd as-applied to certain hypotheticals, § 14-318.5 is not vague as applied to defendant and defendant's vagueness challenge fails.

### 4. Self-Incrimination

Defendant also argues that § 14-318.5 violates constitutional protections against self-incrimination. Notably, § 14-318.5 includes a provision granting immunity from "any civil or criminal liability that might otherwise be incurred or imposed for" reporting the disappearance of a child, provided that the person was acting in good faith. § 14-318.5(g). Thus, defendant does not argue that disclosure would have incriminating potential for crimes charged as a direct result of the report such as prosecution for making a false report. Rather, defendant argues that a report of a child's disappearance to law enforcement is likely to initiate an investigation which could reveal a criminal act related to the disappearance. In that case, the report itself would likely be used as evidence in the criminal prosecution and will have led to other evidence that might be so used. The State argues that § 14-318.5 falls into an exception for "broadly applicable statutory compliance regimes imposed for neutral purposes."

"Under the Fifth Amendment to the United States Constitution, individuals shall not be compelled in any criminal case to be witnesses against themselves." *State v. Diaz*, 372 N.C. 493, 499 (2019) (cleaned up). The privilege against self-incrimination extends to communications " 'that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used.' " *Hiibel v. Sixth Jud. Dist. Ct. of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004) (quoting *Kastigar v. United States*, 406 U.S. 441, 445 (1972)). "To qualify for the Fifth Amendment privilege, a communication must be testimonial, incriminating, and compelled." *Id.* "In order for a communication to be testimonial within the meaning of the Fifth Amendment, it 'must itself, explicitly or implicitly, relate a factual assertion or disclose information.' " *Diaz*, 372 N.C. at 499 (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 589 (1990)). "The vast majority of verbal statements thus will be testimonial because there are very few instances in which a verbal statement, either oral or written, will not convey information or assert facts." *Id.* (cleaned up).

"Whenever the Court is confronted with the question of a compelled disclosure that has an incriminating potential, the judicial scrutiny is invariably a close one." *California v. Byers*, 402 U.S. 424, 427 (1971). Courts must resolve the "[t]ension between the State's demand for disclosures and the protection of the right against self-incrimination" by "balancing the public need on the one hand, and the individual claim to constitutional protections on the other; neither interest can be treated

lightly." *Id.* Thus, statutes that compel disclosure may be constitutional where "the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure." *Id.* at 428.

The Supreme Court of the United States "has on several occasions recognized that the Fifth Amendment privilege may not be invoked to resist compliance with a regulatory regime constructed to effect the State's public purposes unrelated to the enforcement of its criminal laws." *Balt. City Dep't of Soc. Servs. v. Bouknight*, 493 U.S. 549, 556 (1990). Through its case law distinguishing between laws that unconstitutionally compel self-incrimination and constitutional regulatory laws, the Supreme Court has established several relevant considerations including the policy interest behind the law, whether the law targets a group that is inherently suspect of criminal activities, whether the privilege is being applied in an area permeated with criminal statutes or a noncriminal and regulatory area of inquiry, and the possibility of prosecution resulting from the disclosure. *See id.* at 554–59; *Byers*, 402 U.S. at 430.

For example, in *California v. Byers*, the respondent challenged a California law that required drivers of any vehicle involved in an accident resulting in property damage to immediately stop at the scene of the accident and provide their name and address to the owner of the damaged property. *Byers*, 402 U.S. at 426. The Court upheld the law, stating that "the mere possibility of incrimination is insufficient to defeat the strong policies in favor of a disclosure." *Id.* at 428. The Court emphasized

that the statute was part of the California Vehicle Code which, although it defined some criminal offenses, was "essentially regulatory, not criminal." *Id.* at 430. Additionally, the statute "was not intended to facilitate criminal convictions but to promote the satisfaction of civil liabilities arising from automobile accidents." *Id.* The statute was targeted at all persons who drive automobiles in California which the Court did not consider "highly selective" or "inherently suspect of criminal activities." *Id.* at 430–31. The Court also noted that it is not a criminal offense for a driver to be involved in an accident and in fact many accidents occur without the driver having ever been at fault. *Id.* at 431.

Similarly, in *Bouknight*, the Supreme Court of the United States held that a mother could not invoke the privilege against self-incrimination to resist a trial court order requiring her to produce her child in court. 493 U.S. at 551. There, the child had been adjudicated in need of assistance and allowed to remain in the mother's care subject to extensive conditions set forth in a protective supervision order. *Id.* at 552. Months later, the local social services returned to juvenile court fearing for the child's safety. *Id.* at 552. Social services filed a petition stating that on two recent house visits, the mother failed to produce the child or reveal where he could be found. *Id.* at 552–53. Additionally, family members had not recently seen the child. *Id.* at 553. Social services filed a missing persons report which was referred for investigation by the police homicide division. *Id.* The trial court ordered the mother to produce the child in court. *Id.* at 553–54. The mother repeatedly failed to do so and the trial court

held her in contempt. *Id.*

The Supreme Court recognized that producing the child in court could have been testimonial because it would implicitly communicate the mother's control over the child at the moment of production which might aid the State in prosecuting her. *Id.* at 555. Nevertheless, the Court held that the mother could not resist the production order because she "assumed custodial duties related to production and because production is required as part of a noncriminal regulatory regime." *Id.* at 555–56. Considering relevant distinguishing factors, the Court held that the order was imposed "as part of a broadly directed, noncriminal regulatory regime governing children cared for pursuant to custodial orders." *Id.* at 559. The Court defined the group targeted by the order as "persons who care for children pursuant to a custody order" which is not a "selective group inherently suspect of criminal activities." *Id.* at 559. Additionally, similar orders could arise in circumstances "entirely devoid of criminal conduct" and even when criminal conduct may exist, the order can be enforced "for reasons related entirely to the child's well-being and through measures unrelated to criminal law enforcement or investigation." *Id.* at 560–61.

By contrast, in *Marchetti v. United States*, 390 U.S. 39, 40–42 (1968), the Supreme Court concluded that a statutory system for taxing wagers "may not be employed to punish criminally those persons who have defended a failure to comply with their requirements with a proper assertion of the privilege against self-incrimination." In part, the provisions "impose[d] upon those engaged in the business

of accepting wagers an excise tax of 10% on the gross amount of all wagers they accept[.]" *Id.* at 42. Additionally, they required those liable for the tax to register each year with their local internal revenue district and conspicuously display stamps denoting payment of the tax in their place of business. *Id.* at 42–43. At the time, "[w]agering and its ancillary activities [were] very widely prohibited under both federal and state law." *Id.* at 44.

In describing why prosecuting the defendant under these provisions violated his privilege against self-incrimination, the Court noted that "wagering is 'an area permeated with criminal statutes,' and those engaged in wagering are a group 'inherently suspect of criminal activities.' " *Id.* at 47 (quoting *Albertson v. SACB*, 382 U.S. 70, 79 (1965)). Additionally, the information obtained as a consequence of compliance was readily available to and employed by state and federal authorities to enforce criminal penalties for wagering. *Id.* at 47–48. Thus, the provisions created "real and appreciable" hazards of self-incrimination. *Id.* at 48.

Here, defendant may not invoke the privilege against self-incrimination to avoid compliance with § 14-318.5 because it falls into the category of broadly applicable and neutral statutory regimes outlined in *Byers* and *Bouknight*. § 14-318.5 does compel disclosure which is testimonial in nature. Persons liable under the statute are compelled to make a statement which communicates information that could aid in a prosecution including that they were a parent or person providing care for a child, that the child's location is unknown, and potentially when they last had

contact with the child. *See* § 14-318.5(a)–(b).

However, the possibility of incrimination from the disclosure is outweighed by the broad nature of the statute and strong policies in favor of disclosure. § 14-318.5 is a generally applicable public-safety provision promoting the State's interest in the protection of minors. The statute targets all parents or persons providing supervision or care to children which is not a "selective group inherently suspect of criminal activities." In fact, it is an even broader group than the one targeted in *Bouknight* which was limited to persons caring for children pursuant to custodial orders. Additionally, unlike the tax codes in *Marchetti*, § 14-318.5 does not target inherently criminal activity. Reportable disappearances can arise in non-criminal circumstances, and it is not necessarily a crime for a caretaker not to know the location of the child they care for.

Defendant points to this Court's recent decision in *State v. Benton*, 921 S.E.2d 880 (2025), to illustrate that a report under § 14-318.5 is incriminating. There, we upheld a mother's conviction for misdemeanor child abuse for failing to appropriately supervise her young child. *Id.* at 884. However, while a lack of actual knowledge of her daughter's whereabouts was one factor supporting the conviction, there were additional facts that made the mother's conduct criminal. *See id.* at 884–85. The mother had left her six-year-old daughter alone in a park and the daughter wandered off on foot. *Id.* 883 When the mother noticed that her daughter was not in the park, she made no effort to locate her. *Id.* at 885. Additionally, the mother did not answer

the phone calls from the police officers when her daughter was found later that evening. *Id.* at 883. The mother's "lack of diligent supervision" made the mother's conduct criminal, not merely her lack of knowledge of her daughter's whereabouts. *Id.* at 885.

While *Benton* does not mean that lacking knowledge of your child's whereabouts is inherently criminal, it does represent an example of how there is a possibility of prosecution arising from the report of a child's disappearance. The report is made directly to law enforcement who will likely initiate an investigation to locate the child. *See* § 14-318.5(b). Such an investigation could lead to criminal charges against the reporter surrounding the child's disappearance. However, some risk of prosecution was present in both *Bouknight* and *Byers*. Defendant has not demonstrated that the risk of prosecution posed by § 14-318.5 is significantly different such that it outweighs the other factors in favor of disclosure.

We find *Bouknight* particularly instructive. There, the police had already been notified of the child's potential disappearance and had initiated an investigation within their homicide division. Additionally, the person being compelled, the mother, was already under suspicion of mistreatment of the child that could have led to prosecution. Comparatively, defendant and other caretakers liable under § 14-318.5 arguably face a lower risk of prosecution. Meanwhile, the information disclosed and the policy promoting the compelled disclosure are exceedingly similar here and in *Bouknight*. In both cases, the disclosure surrounds acknowledgment of caretaking

responsibilities over a child at a certain time and the disclosure is compelled to protect the safety of the child. Therefore, we hold that *Bouknight* and *Byers* apply and defendant may not invoke his privilege against self-incrimination to resist compliance with § 14-318.5. Accordingly, the trial court did not err by denying defendant's motion to dismiss on that ground.

## B.     Sufficiency of the Evidence

Defendant next argues that there was insufficient evidence he violated § 14-318.5. Specifically, defendant contends that the evidence presented at trial tended to show that he believed Mary was home with Diana and it would be absurd to construe § 14-318.5 to not allow "a step-parent to rely upon the statements of a parent who says the child is with them and everything is fine." Defendant emphasizes that he was in Michigan after Mary stopped attending school, worked long hours and spent his free time in his garage, and that Diana represented to him that Mary was with her.

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62 (2007) (citations omitted). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense. If so, the motion is properly denied." *State v. Fritsch*, 351 N.C. 373, 378 (2000) (quoting *State v. Powell*, 299 N.C. 95, 98 (1980)). Substantial evidence exists if there "is such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78 (1980) (citations omitted). "In making its determination, the trial court must consider all evidence admitted, whether competent or incompetent, in the light most favorable to the State, giving the State the benefit of every reasonable inference and resolving any contradictions in its favor." *State v. Rose*, 339 N.C. 172, 192–93 (1994) (citations omitted).

Conviction under § 14-318.5 requires that the State show that defendant "knowingly or wantonly" failed to report the disappearance of a child. N.C.G.S. § 14-318.5(b). "As commonly defined, 'knowingly' entails actual knowledge." *State v. Ford*, 388 N.C. 713, 724 (2025). "Knowledge is a mental state that may be proved by offering circumstantial evidence" including the defendant's conduct and statements. *State v. Bogle*, 324 N.C. 190, 195 (1989). Meanwhile, "wantonness connotes intentional wrongdoing. Conduct is wanton when in conscious and intentional disregard of and indifference to the rights and safety of others." *State v. Brackett*, 306 N.C. 138, 142 (1982) (cleaned up).

Here, the State presented substantial evidence that defendant knew Mary had disappeared and failed to report her disappearance. Defendant went several weeks without seeing Mary, received communications from the school that Mary had been absent, asked Diana where Mary was and confirmed that she lied to him, looked for Mary and was unable to locate her in the home, and was aware of Diana's increasingly erratic behavior and seemingly delusional belief that she needed to hide Mary.

Defendant's behavior provides circumstantial evidence that he was aware that he did not know Mary's location. Additionally, there was no evidence that defendant had contact with Mary during that time, which greatly exceeded 24 hours.

While defendant also presented evidence that Diana had represented to him that Mary was safe with her, the jury is not required to believe that defendant was in fact persuaded by Diana's representations. When viewed in the light most favorable to the State, there was enough relevant evidence as a reasonable mind might accept as adequate to support the conclusion that defendant knew Mary had disappeared. Accordingly, the trial court did not err in denying defendant's motion to dismiss for insufficient evidence.

## C. Admissibility of Diana's Text Message

At trial, defendant sought to introduce evidence of a text message that Diana had sent to her cousin during the period of time where Mary was alleged to have been missing. The text message was signed "Diana and [Mary]." The State objected on the grounds of hearsay and relevance. Defendant argued that the text message was relevant and not hearsay because it corroborated his testimony that Diana had represented to him that Mary was with her during the alleged period of disappearance. The trial court excluded the text message as hearsay, stating that it was being presented for the truth of the matter asserted: that Mary was safe with Diana. As an alternative ground for excluding the text message, the trial court also concluded that it was irrelevant. Defendant argues on appeal that the trial court

erred in excluding the text message and that the error was prejudicial because this was a "close case" that turned on the credibility of defendant as a witness.

"When preserved by an objection, a trial court's decision with regard to the admission of evidence alleged to be hearsay is reviewed *de novo*." *State v. Johnson*, 209 N.C. App. 682, 692 (2011). While relevancy of evidence is also a question of law that is reviewed *de novo*, a trial court's ruling on relevancy is accorded great deference on appeal. *State v. Triplett*, 368 N.C. 172, 175 (2015). "Even where this Court finds the trial court's evidentiary decision was in error, however, 'evidentiary error does not necessitate a new trial unless the erroneous admission was prejudicial.' " *State v. Teel*, 296 N.C. App. 532, 542 (2024) (quoting *State v. Wilkerson*, 363 N.C. 382, 415 (2009)). To show prejudice, a defendant must demonstrate that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." N.C.G.S. § 15A-1443(a).

We need not determine whether the text message was excluded in error because defendant has failed to demonstrate prejudice. The jury was already presented with evidence outside of defendant's own words that Diana had represented to him that Mary was with her. During his testimony, defendant entered into evidence a separate text message from Diana to defendant saying "we're in town[,]" implying that she was with Mary. In light of that already existing evidence, Diana's text message to her cousin would not have been likely to make a significant

impact on the jury.

Moreover, since defendant did not indicate he had knowledge of the text message to Diana's cousin, it would not have strengthened the evidence that defendant *believed* Diana's representations. Defendant's state of mind was a key issue in this case and as discussed above, there was substantial evidence indicating that defendant knew that Mary had disappeared. Most notably, defendant testified that he caught Diana lying to him about Mary's whereabouts at least once, and a detective testified that defendant told him in an interview, "I didn't find out she was missing until like a week after I got back[.]" In the face of that evidence, there is not a reasonable probability that the outcome would have been different if the jury had been presented with the text message to Diana's cousin. Accordingly, we find no reversible error in the trial court's exclusion of the text message.

## III. Conclusion

For the foregoing reasons, we affirm defendant's conviction for violating N.C.G.S. § 14-318.5.

NO ERROR.

Judges CARPENTER and GRIFFIN concur.